# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| NAIR RODRIGUEZ, as next of kin to, | ) | |
| the ESTATE OF LUIS RODRIGUEZ, | ) | |
| NAIR RODRIGUEZ, individually, and | ) | |
| LUINAHI RODRIGUEZ, individually, | ) | CASE NO. CIV-2016-150-D |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WARREN THEATRES, LLC, | ) | |
| OKLAHOMA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT BRIAN CLARKSTON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

s/ David W. Kirk
Michael C. Felty, OBA No. 10804
David W. Kirk, OBA No. 11386
Stacey S. Chubbuck, OBA No. 22523
Lytle Soulé & Curlee, P.C.
119 North Robinson, Suite 1200
Oklahoma City, OK 73102
405.235.7471–Telephone
405.232.3852–Facsimile
kirk@lytlesoule.com
jones@lytlesoule.com
**Attorneys for Defendant Brian Clarkston**
        And
Gary J. James, OBA No. 12718
Gary J. James & Assoc., P.C.
P.O. Box 2443
Oklahoma City, OK 73101-2443
Telephone: (405) 521-9900
Facsimile: (405) 488-0529
**Attorney for Brian Clarkston,**

        And
Kathryn D. Terry
kdterry@phillipsmurrah.com
Cody J. Cooper
cjcooper@phillipsmurrah.com
PHILLIPS MURRAH
Corporate Tower
101 N. Robinson Ave., 13th Floor
Oklahoma City, OK 73102
**Attorneys for Brian Clarkston**

March 16, 2017

Defendant Brian Clarkston's Motion for Summary Judgment and Brief in Support . . . . . 1

Brief in Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Plaintiffs' Theories of Liability Against Clarkston . . . . . . . . . . . . . . . . . . 9

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PROPOSITION I: PLAINTIFFS' "EXCESSIVE FORCE" AND "§ 1983" CLAIMS
AGAINST CLARKSTON FAIL BECAUSE: A) HE WAS EITHER ACTING IN HIS
"OFFICIAL CAPACITY" AS A MOORE OFFICER AND THIS IS A CLAIM AGAINST
THE CITY, NOT HIM; OR, B) HE WAS ACTING IN HIS "INDIVIDUAL CAPACITY"
AND IS ENTITLED TO QUALIFIED IMMUNITY; AND, C) THERE IS NO EVIDENCE
TO SHOW A VIOLATION BY CLARKSTON OF ANY FEDERAL RIGHT; OR, D) HE
WAS NOT A STATE ACTOR DUE TO HIS PRIVATE EMPLOYMENT AND THE
FEDERAL CLAIMS WILL NOT LIE AGAINST HIM . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    "Official Capacity" claims lie against the government, not an
        individual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    B.    Clarkston is entitled to "qualified immunity" for "individual"capacity
        claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    There is no evidence Clarkston violated anyone's Constitutional rights . . 14

    D.    Alternatively, Clarkston was not a "state actor." Federal claims will
        not lie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

PROPOSITION II: THE NEGLIGENCE CLAIM FAILS BECAUSE: A) PLAINTIFFS'
ALLEGATIONS AND THE UNDISPUTED EVIDENCE SHOW "PROBABLE CAUSE"
TO ARREST MR. RODRIGUEZ AND TO USE FORCE TO DO SO; B) ALL FORCE
WAS PRIVILEGED AND REASONABLE AS A MATTER OF LAW; AND, C)
CLARKSTON PARTICIPATED IN HIS "OFFICIAL" CAPACITY, NOT AS A PRIVATE
EMPLOYEE, AND RETAINS *SOVEREIGN IMMUNITY* TO ANY TORT THEORY
ALLEGED AGAINST HIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    There was no "negligence." Arrest occurred with probable cause after
        crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

     B.     There was no "negligent" use of force and there was no
           "excessive" force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     C.     Clarkston was acting in his "official capacity" as a law enforcement officer
           and not a private employee.  He retains *sovereign immunity* . . . . . . . . . . 21

PROPOSITION III: CLARKSTON WAS PRIVILEGED TO USE FORCE TO BRING MR.
RODRIGUEZ INTO CUSTODY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

PROPOSITION IV: "INFLICTION OF EMOTIONAL DISTRESS" FAILS SINCE THERE
IS NO EVIDENCE OF "OUTRAGEOUS" CONDUCT AND PLAINTIFFS WERE NOT
TOUCHED BY ANY DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.     There is no individual claim for emotional suffering in this case . . . . . . . 26

     B.     There is no "outrageous" conduct by Clarkston for an "intentional infliction"
           theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     C.     Oklahoma only recognizes "intentional infliction of emotional distress" for
           "bystanders" under circumstances not present in this case . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

*Aldaba v. Pickens,* 777 F.3d 1148 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Anneler v. State*, 1951 OK CR 35, 229 P.2d 238, . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Archuleta v. Wagner*, 523 F.3d 1278, (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 10, 11
*Bosh v. Cherokee County Bldg. Authority,* 2013 OK 9, 305 P. 3d 994 . . . . . . . . . . . . . . 19, 23
*Brokers Choice of America, Inc. v. NBC Universal, Inc.,* 757 F. 3d 1125(10th Cir. 2014) 16
*DeCorte v. Robinson,* 1998 OK 87, 969 P. 2d 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
*Duncan v. Gunter*, 15 F. 3d, 989, (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*E.F.W. v. St. Stephens Indian High School,* 264 F. 3d 1297(10th Cir. 2001) . . . . . . . . . . 16
*Hall v. Witteman*, 584 F. 3d 859, (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Hidahl v. Gilpin*, 938 F.2d 1150, (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Kingsley v. Hendrickson*, 576 U.S.___, 135 S.Ct. 2466 . . . . . . . . . . . . . . . . . . . . . . 13
*Kraszewski v. Baptist Medical Center of Oklahoma, Inc.,* 1996 OK 141, 916 P.2d 241  28
*Martin v. City of Oklahoma City*, 180 F. Supp. 3d 978, (W.D. Okla. 2016) . . . . . . . 11, 13
*Medina v. City & County of Denver*, 960 F.2d 1493,(10th Cir. 1992) . . . . . . . . . . . . . . 11

*Morales v. City of Oklahoma City,* 2010 OK 9, 230 P. 3d 869 . . . . . . . . . . . . . 19, 20, 26

*Morris v. Noe,* 672 F.3d 1185, 1191 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mullenix v. Luna,* 577 U.S. _____, 136 S. Ct. 305, 193 L.Ed. 2d 255 (2015) . . . . . . . . 12, 13

*Park v. Gaitan,* No. 15-2020, 2017 WL 782280 at *5 (10th Cir. Mar. 1, 2017) . . . . . . . 11

*Pelligrino v. State, ex rel. Cameron University,* 2003 OK 2, 63 P.3d 535 . . . . . . . . . . . . . 22

*Perry v. City of Norman,* 2014 OK 119, 341 P. 3rd 689 . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pietrowski v. Town of Dibble,* 134 F. 3d 1006, (10th Cir. 1998) . . . . . . . . . . . . . . . . . . 10

*Schaeffer v. Salt Lake City Corporation,* 814 F. 3rd 1151, (10th Cir. 2016) . . . . . . . . . . 16

*Terry v. Ohio,* 392 U.S. 1 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Benoit,* 713 F. 3rd 1, (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*White v. Pauly,* 580 US ___, (January 9, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wittner v. Banner Health,* 720 F. 3d 770, (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . 16

## STATUTES

12 O.S. § 1053 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

12 O.S. § 1053(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

12 O.S. § 1054 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 O.S. § 540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21 O.S. § 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

21 O.S. §642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

21 O.S.§ 644 (C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21 O.S. § 649(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21 O.S. § 649(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

22 O.S. § 37.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

22 O.S. § 40.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

22 O.S. § 196(1) (A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

51 O.S. § 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

51 O.S. § 152.1(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25

51 O.S. § 153(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

51 O.S. § 163 (C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25

## MISCELLANEOUS

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FRE 201(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

L.Cv. R. 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

L.Cv.R. 56.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14, 15, 16, 17, 20

OUJI 19.1, 19.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Moore Ordinances 10-606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Moore Ordinances 10-607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Moore Ordinances 10-608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

NAIR RODRIGUEZ, as next of kin to,            )
the ESTATE OF LUIS RODRIGUEZ,                )
NAIR RODRIGUEZ, individually, and            )
LUINAHI RODRIGUEZ, individually,             )    CASE NO. CIV-2016-150-D
                                             )
Plaintiffs,                                  )
                                             )
vs.                                          )
                                             )
WARREN THEATRES, LLC,                        )
OKLAHOMA, *et al.*                           )
                                             )
Defendants.                                  )

## DEFENDANT BRIAN CLARKSTON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

COMES NOW the Defendant Brian Clarkston, pursuant to Fed. R. Civ. P. 56 and L.Cv. R. 56.1, and moves the Court to enter judgment in his favor and against the Plaintiffs. There is no dispute regarding any material fact and Clarkston is entitled to judgment as a matter of law.

## BRIEF IN SUPPORT

**A. Undisputed Facts:**    Pursuant to L.Cv.R. 56.1(b), Clarkston shows the Court that there is no dispute regarding the following material facts:

1)    Plaintiff Nair Rodriguez ("Nair") is the mother of co-Plaintiff Luinahi Rodriguez ("Luinahi") and the surviving spouse of Luis Rodriguez, deceased ("Luis"). At the time of the incidents at issue, February 14-15, 2014, Luinahi was a senior in high

school, living with her parents. (Exhibit 1, Deposition of Nair Rodriguez, at pp. 23-24, 37, 44- 45; Exhibit 2, Deposition of Luinahi Rodriguez, at pp. 12-14)

2)     The family attended different movies at the Warren Theatres LLC, Oklahoma's movie theater complex in Moore, Oklahoma, on the evening of Valentine's Day, February 14, 2014. (Ex. 1, pp. 60 - 66; Ex. 2, pp. 72-76)

3)     Luinahi attended a movie with friends in Warren's IMAX theater. The same movie was also showing at a normal screening in the main complex. Mr. and Mrs. Rodriguez went to a movie in the main complex. (Ex. 1, pp. 60- 67; Ex. 2, pp. 75- 76)

4)     When Mr. and Mrs. Rodriguez's movie ended they went looking for their daughter and entered a screening of the movie Luinahi attended. Not knowing that Luinahi attended the IMAX screening, Mr. and Mrs. Rodriguez entered the wrong theater. (Ex. 1, pp. 67-68; Ex. 2, pp. 76-77)

5)     When Nair could not locate her daughter in the wrong theater, she began calling and texting her on her cell phone. The two exchanged many texts and had several angry conversations. (Ex. 1, pp. 68-72; Ex. 2, 78-81)

6)     Nair and Luis exited the complex and walked towards the IMAX theater, where they encountered their daughter on the sidewalk. Nair struck her daughter, repeatedly. These acts were recorded on two separate cameras maintained by Warren Theatres. (Ex. 1, pp. 72-73, 78-81; Ex. 2, pp. 83; Exhibit 3, disc with three folders, each containing a separate video. One is labeled "Nair striking daughter," the second is titled

2

"Nair cell phone" and is the video Mrs. Rodriguez shot with her cell phone. The third and final folder is labeled "Warren Theatres parking lot" and is from a security camera.)

7)    Nair has a history of striking her children. She has "bipolar" condition, which she says makes her volatile. Nair had been detained by Norman, Oklahoma, police and taken to Red Rocks Behavioral Center for emergency observation after violently striking another daughter at the River Wind Casino, before February, 2014. She has also been taken in for emergency observation when her family believed she was possessed by "the devil." This occurred after February, 2014. (Ex. 1, pp. 23, 47-48, 51-52, 333, 431-433; 450-451; Ex. 2, pp. 55-62; www.nimh.nih.gov/health/topics/bipolar-disorder)

8)    A patron at Warren Theatres reported that a "fight" was occurring in the parking lot and Warren security personnel Strang and Howser left the movie complex and went into the parking lot to investigate. (Exhibit 4, Deposition Chad Strang, pp. 24, 39-42; Exhibit 5, Deposition Brian Clarkston, pp. 54-56)

9)    Brian Clarkston was a Sergeant with the Moore Police Department. He also worked private security during his "off duty" hours. Clarkston has been CLEET certified at all times in his career and was so certified on February 14-15, 2014. The Warren Theatres employs "off duty" law enforcement officers for security and relies on their governmental training and CLEET certification. (Exhibit 6, CLEET certification Clarkston; Ex. 5, pp. 16, 27-28; 44; Exhibit 7, Affidavit of Dan Gray)

3

10)   Defendant Howser approached Nair in the parking lot. He stated there had been a report of a fight. Nair admitted she had hit her daughter.[1]   (Ex. 1, pp. 87-90)

11)   Defendant Strang approached Luis and Luinahi. Strang stood in front of Luis, who tried to step around Strang. Luis was upset and it appeared to Strang that he was trying to get around him in order to approach Nair. All law enforcement personnel are trained to keep people involved in domestic violence incidents separated from one another while an investigation occurs. (Ex. 2, pp. 239; Ex. 4, pp. 44-53, 55, 58-65, 92-3, 96-7; Ex. 5, pp. 117-19,123-29; Exhibit 8, Deposition Joseph Bradley, pp. 12-19,22-4; Exhibit 9, Deposition Ryan Minard, pp. 37-40,47-9, 52-60, 62, 65-6, 74-6)

12)   Strang told Luis that a patron reported a fight and that he was investigating. Luis, at first, said "it's none of your business." When Strang repeated himself, Luis said, "alright, alright, my wife hit my daughter. But it's a family matter and we don't want you involved." Strang asked Luis to provide identification, since the first step in any criminal investigation is to identify the parties who were involved in an incident, or who might have been a witness. Luis replied, "No, I'm not going to give you anything." He then crossed his arms on his chest. (Ex. 4, pp. 48-53, 58-65, 92-3, 117, 121-22)

13)   As this exchange was occurring, Defendants Clarkston, Bradley and Minard approached. Although Clarkston was "off duty," Bradley and Minard were both "on duty" patrol officers for the Moore Police Department. They were at the Warren Theatres'

---

[1]Defendant Howser has not been deposed by Plaintiffs' counsel, although his

4

business premises to assist with two other patrons.   An ambulance was also at the
Theatres' premises at the time, for the same reason.   All officers present, whether "on
duty" or "off duty," felt they were obligated to investigate an incident of "domestic
violence" since it indicated criminal activity had occurred. (Ex. 4, pp. 22-3, 53-4; Ex. 5,
pp. 117-19, 122-32, 166, 173, 183-7; Ex. 8, pp. 22-26; Ex. 9, pp. 28-31, 37-38, 47-52, 65-
69 )

    14)    Clarkston, Bradley and Minard stood by Strang just as Luis folded his arms
and said he would not provide identification.   Clarkston, although senior in experience to
both Minard and Bradley, did not consider himself to be the senior officer on the scene
since he was working an "off duty" private job at the time. (Ex. 4, pp. 54-55; Ex. 5, pp.
58-59, 65; Ex. 8, pp. 23; Ex. 9, pp. 24-25, 48)

    15)    Bradley asked Luis to identify himself and he again refused.   Clarkston
recalls Bradley saying, "fine, but you will have to be detained while we complete our
investigation." Luis was not free to go.  (Ex. 4, pp. 62-65, Ex. 5, pp. 129-30,140-41, 149-
52, 158-9; Ex. 9, pp. 40-42, 74-77)

    16)    Luis was a large man, standing some 6 feet tall and weighing nearly 300 lbs.
When Bradley told Luis either he would be arrested or would have to be detained, Luis
took a step back with his right leg.  All individual defendants perceived this as an effort to
brace for physical exertion.  Luis then began to raise both of his hands above his waist and

testimony has been scheduled and cancelled on multiple occasions.

started to ball them into what would have been fists. All officers believed from their experience and observations of Luis's attitude, demeanor and physical acts that he intended to throw a punch at the much smaller Joseph Bradley, who was less than an arm's reach from him. Minard was standing to Luis's left. Believing that his brother officer was about to be punched by a much larger man, Minard reached out with his right hand and grabbed Luis's left wrist. Luis shook his left arm upward and backward, lifting Minard off the ground, and both men stumbled backward and fell in a spinning movement. (Ex. 4, pp. 65-71; Ex. 5, pp. 133-34,140-43,149-52, 158-64, 218; Ex. 9, pp. 40-46, 74-82, 88-94)

17)   Once Luis and Minard were on the ground, Bradley, Clarkston and Strang began to try to pull Luis's arms behind him so that handcuffs could be placed. All officers told Luis to quit resisting, but he did not do so and continued to throw elbows and kicks at the officers.    He put his arms under his torso while he was on his stomach, which prevented the officers from being able to secure him. Clarkston was beside Luis's left torso and Minard was on his right side. All were trying to get his arms out to cuff him. (Ex. 4, pp. 77-82, 97-98; Ex. 5, pp. 163-65, 227-32; Ex.9, pp. 101-05, 112-13)

18)   Howser ran to the scene of the scuffle and Nair followed. The security video footage, which is from a distance and grainy, shows that she arrived at the scuffle approximately 14 seconds after it started. As she arrived, she began reaching in her purse. Afraid that she might be reaching for a firearm, Strang got to his feet, approached her, but

6

did not touch her, and told her to stay away.  Nair retrieved her cell phone from her purse

and began filming.  Clarkston was still holding Luis's left torso.  Howser arrived before

Nair and got on his knees to restrain Luis's legs.  Nair's video shows the officers trying to

cuff Luis for 58 seconds.  The officers then stand up.  Her video does not show any blows

by any Defendant.  Nair does not know which officer is Clarkston, or what he did.  (Ex. 1,

pp.  62-4, 107-110; Ex. 4, pp. 83-4, 90, 96-99; Ex.5, pp. 227-31; Ex. 9, pp. 125-35; Ex. 3,

Disc, folder labeled "Warren Theatres parking lot" showing: Strang stops to talk to Luis at

5:21of elapsed time into the folder and Luis tries to get around him; Luis tries to get

around Strang a second and third time at 5:27 and 5:34 of the elapsed time of the folder;

Clarkston, Bradley and Minard arrive at 5:41 of the folder; Luis steps back to deliver a

blow at 6:12; Luis and Minard tumble backwards at 6:14; the other officers follow Luis

and Minard at 6:15; Howser starts to run to the scuffle at 6:17 and arrives at 6:21; the

scuffle is on the ground at 6:21; Nair arrives at the scuffle at 6:29; two officers speak to

Nair at 6:32; Nair starts taping at 6:32; the struggle appears to stop at 7:00; the officers

stand up at 8:15; Ex. 3, Disc, folder labeled "Nair cell phone" shows the struggle in

progress as she starts filming, although the efforts are to hold Luis in place while Minard

attempts to place cuffs on him; the officers begin to stand up at :58 of elapsed time in the

folder; Luis is rolled over and set up at 1:40 of elapsed time; and the ambulance arrives

less than a minute later at 2:37; Exhibit 10, OSBI authentication of phone video.[2]

_____

[2]The videos, taken together, establish that Mr. Rodriguez was on the ground in a

19)   After Luis stopped struggling and handcuffs were placed, Strang suggested he be set up so that he could lean against Strang's leg.  Luis was breathing at the time. Strang had attended a law enforcement seminar just that day regarding "defensive tactics" and all events occurred with appropriate force based on his training. Clarkston suggested to Bradley that a Moore supervisor be called to the scene and that medical personnel be requested.  This was done just because it is Moore's policy to do so after any use of "force."  Clarkston made these remarks as a reminder to Bradley, not because Clarkston was a "senior officer" on the scene, but simply because he had been with Moore's Police Department longer than either Bradley or Minard. (Ex. 4, pp. 18, 79-80, 99-102, 106-107; Ex. 5, pp. 165-69; Ex. 9, pp. 125-33; Exhibit 11, Strang CLEET certification showing attendance on February 14, 2014, at 8 hour seminar on "defensive tactics." )

20)   Ambulance personnel were already at the Warren Theatres and were at the scene within moments.[3]  Their records show that Luis was breathing when they arrived at 0027 (12:27 a.m.; the times on this report reflect military chronological time, not elapsed time on a video), they began administering CPR at 0030, a cardiac monitor was placed at 0033, "fast patches" (chemical stimulants) were placed at 0037 and cardiac stimulants Epinephrine (an anti arrhythmic cardiac stimulant) and Atropine (a stimulant for cardiac arrest) were administered at 0045 and 0049.  Luis was in the Emergency Room of Norman

---

struggle for 39 seconds.  He was on his stomach before being rolled over and set up about 1 minute and 40 seconds after that.  An ambulance arrived less than a minute later.

Regional's Moore facility within 4 minutes of this last time, arriving at 0053.   The ambulance attendants noted their "clinical impression" that Luis was experiencing "Cardiac Arrest."   (Exhibit 12, Ambulance run report; Exhibit 13, Norman Regional Moore Medical Center Emergency Department Report; www.pdr.net/drugsummary/ xylocaine-xylocaine-with-epinephrine; www.pdr.net/drug-summary/Atropine-Sulfate)

21)   Luis was in the Emergency Room of Norman Regional's Moore facility, after presenting with a "CHIEF COMPLAINT" of "Cardiac arrest."  EKG interpretation was "abnormal, acute MI."   Dr. Mantooth "coded" Luis at 0144.   Dr. Mantooth was "unable to get his heart to respond to any of the medications here."   (Ex. 13, Norman Regional's Records, at "emergency Department Report" [Ex. 13, pp. 1-5] and EDM Patient Record, Patient Notes, numbered in the upper right hand corner as pp. 3 and 4.)

**B.  Plaintiffs' Theories of Liability Against Clarkston**     Plaintiffs' Third Amended Petition asserts ten separate causes of action.  The following are alleged against Clarkston: the Sixth, for "negligence" [Doc. 1-105, ¶¶ 103-104], the Seventh, for "excessive force" in violation of the "4th Amendment to the US Constitution" against Clarkston "acting in his capacity with the Defendant, City of Moore" [¶¶ 105-109],  the Eighth for "42 U.S.C. § 1983" for "deprivations of (unnamed) rights, privileges and immunities secured by the Constitution of the United States and laws thereof..." due to "cruel and unusual treatment" caused by the "custom or practice of the Defendants, Officer Brian Clarkston and the City

---

[3]The ambulance personnel, Defendants Rudolph and Smith, have not been deposed.

9

of Moore" [¶¶ 110-113];  the Ninth Cause for "assault/battery" [¶¶114-115] and the Tenth

for "infliction of emotional distress" [¶¶ 116-118].

## ARGUMENT AND AUTHORITIES

**PROPOSITION I: PLAINTIFFS' "EXCESSIVE FORCE" AND "§ 1983" CLAIMS AGAINST CLARKSTON FAIL BECAUSE: A) HE WAS EITHER ACTING IN HIS "OFFICIAL CAPACITY" AS A MOORE OFFICER AND THIS IS A CLAIM AGAINST THE CITY, NOT HIM; OR, B) HE WAS ACTING IN HIS "INDIVIDUAL CAPACITY" AND IS ENTITLED TO QUALIFIED IMMUNITY; AND, C) THERE IS NO EVIDENCE TO SHOW A VIOLATION BY CLARKSTON OF ANY FEDERAL RIGHT; OR, D) HE WAS NOT A STATE ACTOR DUE TO HIS PRIVATE EMPLOYMENT AND THE FEDERAL CLAIMS WILL NOT LIE AGAINST HIM.**

**A.    "Official Capacity" claims lie against the government, not an individual.**

Plaintiffs do not allege whether Clarkston was acting in his "official capacity" as a

Moore police officer, even when they allege he was acting as a Moore police officer.

(Doc. 1-105, ¶¶ 105-113] If Plaintiffs' federal claims are against him in his "official"

capacity, the claims are truly against the City of Moore only.  An individual defendant

bears no personal liability for such "official capacity" claims.  *Pietrowski v. Town of*

*Dibble*, 134 F. 3d 1006, 1009 (10th Cir. 1998); *Duncan v. Gunter*, 15 F. 3d, 989, 991 (10th

Cir. 1994).

**B.    Clarkston is entitled to "qualified immunity" for "individual" capacity claims.**

A defendant sued in his "individual" capacity for a violation of Federal

Constitutional rights is entitled to raise the defense of qualified immunity.  *Archuleta v.*

*Wagner*, 523 F.3d 1278, 1282 (10th Cir. 2008).  When the defense is asserted, plaintiff must show: (1) violation of a constitutional right (2) which was clearly established. *Morris v. Noe,* 672 F.3d 1185, 1191 (10th Cir. 2012).  The law *presumes* immunity in favor of public officials acting in their individual capacities.  *Hidahl v. Gilpin,* 938 F.2d 1150, 1155 (10th Cir. 1991).  A Supreme Court or Tenth Circuit opinion on point clearly establishes the law for qualified immunity analysis.  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

"An officer violates a Plaintiff's Fourth Amendment right to be free from unlawful seizure when the officer effectuates 'a highly intrusive or lengthy [warrantless] search or detention' without 'probable cause to believe that a criminal offense has been or is being committed…Consequently, in a §1983 action based on a warrantless arrest, the defendant may be entitled to qualified immunity if he had probable cause to arrest the plaintiff.'" *Park v. Gaitan,* No. 15-2020, 2017 WL 782280 at *5 (10th Cir. Mar. 1, 2017), (citations omitted).  Probable cause is assessed under a reasonableness standard looking at all the facts and circumstances within the officers' knowledge. *Id.*

"If officers had 'arguable probable cause' to arrest Plaintiff, they are entitled to qualified immunity." *Martin v. City of Oklahoma City,* 180 F. Supp. 3d 978, 990 (W.D. Okla. 2016).  "To prevail on an excessive force claim, a plaintiff must prove 'that the officers used greater force than would have been reasonably necessary to effect a lawful arrest,' regardless whether the arrest was in fact lawful." *Id.,* 180 F. Supp. 3d at 992.

11

The United States Supreme Court has recently revisited these principles and admonished District Courts to frame issues of "qualified immunity" as narrowly as possible, given the factual situation at issue, and not to make decisions about whether the law was clearly established based on generalized concepts. *White v. Pauly,* 580 US ___, (January 9, 2017) (Slip Opinion, at p. 5-7) (Supreme Court grants writ of Certiorari and vacates Tenth Circuit's opinion affirming District Court's denial of qualified immunity in excessive force case alleging deprivation of 4th Amendment rights because the Tenth Circuit incorrectly applied the "clearly established" analysis). *Mullenix v. Luna,* 577 U.S. _____, 136 S. Ct. 305, 193 L.Ed. 2d 255 (2015).[4] *See also, Aldaba v. Pickens,* 777 F.3d 1148 (10th Cir. 2015) (denial of officers' request for qualified immunity affirmed), *Cert. Granted and Reversed,* 136 S. Ct. 479 (with instructions to reconsider in light of *Mullenix, supra), after remand,* ___ F.3d ___, 2016 WL 7367765 (December 20, 2016), at p. 4 of 9 (whether officers are entitled to qualified immunity for alleged use of excessive force in violation of the 4th Amendment requires review of facts establishing excessive force

---

[4]*Mullenix* involved the Supreme Court's reversal of the Fifth Circuit's denial of "qualified immunity" to a trooper who fatally shot a fleeing motorist with a rifle from an overhead bridge.   The Fifth Circuit had considered whether the law was "clearly established" that deadly force could not be used against a fleeing felon who did not pose a threat to the public or other officers.   The Supreme Court reversed the Fifth Circuit's denial of qualified immunity because it previously advised Courts not to "define clearly established law at a high level of generality."   Because "qualified immunity" protects all but the plainly incompetent, precedent virtually on point with any contested fact pattern must exist to "clearly" show that challenged conduct was prohibited at the time it occurred.   The relevant inquiry is "whether existing precedent placed the conclusion that Mullenix acted unreasonably in these circumstances 'beyond debate.'" 136. S. Ct. at 309.

against existing precedent to see *whether every reasonable official would have known that those facts would "beyond debate" establish excessive force.) Citing, Mullenix,* at 312. *(Emphasis added.)* Also, an inquiry into whether "qualified immunity" applies is conducted only on "the facts that were knowable to the defendant officers." *White,* (slip opinion, at p. 3) *citing, Kingsley v. Hendrickson,* 576 U.S.___, 135 S.Ct. 2466 (2015, Slip Opinion, at p. 9)

The undisputed evidence establishes that Clarkston had probable cause to assist in making the arrest of Mr. Rodriguez based on the information he knew at the time. It is undisputed that Clarkston knew a witness reported a fight. (UF 8) Clarkston saw that Mr. Rodriguez was agitated and attempting to go around Strang. (UF 11-16) Rodriguez himself confirmed that there had been an incident of domestic violence when he told the officers that his wife hit his daughter. (UF 12-14) Finally, Clarkston witnessed Rodriguez take a fighting stance, leading Officer Minard to grab his arm in order to prevent a blow to Officer Bradley. Rodriguez threw Minard to the ground (UF 16) These all establish probable cause for arrest. Clarkston's efforts during the arrest were limited to holding Mr. Rodriguez's legs and placing handcuffs. There is no evidence Clarkston ever struck Mr. Rodriguez or that he was ever "on top" of him, putting pressure on him. In short, there is no evidence that Clarkston "used greater force than would have been reasonably necessary to effect a lawful arrest." *Martin,* 180 F. Supp. 3d, at 992.

Nor is there any "clearly established" precedent which makes it "beyond debate"

that he could not stand by while other officers questioned Rodriguez about his identity, following two admissions that "domestic battery" had occurred. Both Oklahoma law and Moore's ordinances obligated Mr. Rodriguez to assist the officers while they investigated criminal conduct they were obligated to report.[5] Neither was it "clearly established" that "every reasonable officer" would have known it was "beyond debate" that Luis could not be arrested after he assaulted and battered the Moore officers. Similarly, there is no Tenth Circuit or Supreme Court opinion on point showing that continuing to hold Rodriguez's side on the ground while other officers struggled to place handcuffs on him, while he continued to actively resist, was somehow a constitutionally impermissible use of force. There is nothing to show that any reasonable officer would have known that it was "beyond debate" that Clarkston's conduct was prohibited "excessive force." He is entitled to "qualified immunity" with respect to any § 1983 claim.

**C.    There is no evidence Clarkston violated anyone's Constitutional rights.**

The same comments made in B above show that there is no evidence Clarkston deprived Luis Rodriguez of any guaranteed right, whether a 4th Amendment right or an unnamed "privilege and immunity." Actions of all officers, including Clarkston, were first undertaken when the officers had a "reasonable suspicion" that criminal activity had

---

[5]Once officers learn of "domestic abuse," a parent's battery of a child, 21 O.S.§ 644 (C), there is a duty "to keep a record of each reported incident of domestic abuse..." 22 O.S. § 40.6. Contrary to Plaintiffs' allegations, the defendant officers could not have honored Mr. Rodriguez's request to leave his family alone without breaking the law themselves.

14

between the defendant's alleged conduct and the defendant's badge of state authority to demonstrate that action is taken "under color of state law. The only proper defendants in a § 1983 action are those who represent the government in some capacity. *E.F.W. v. St. Stephens Indian High School,* 264 F. 3d 1297, 1305 (10th Cir. 2001), (state funds for tribal social services using state's rules did not render actions of tribal employees to be "under color of law.")

The Tenth Circuit has considered "joint action" by private entities, to show "state action." *Schaeffer v. Salt Lake City Corporation,* 814 F. 3rd 1151, 1156-57 (10th Cir. 2016), (parking enforcement officers did not constitute "state action" when they made purportedly false accusations against plaintiff because there was no "joint action" with the police to arrest and prosecute plaintiff by simply providing information); and, *Brokers Choice of America, Inc. v. NBC Universal, Inc.,* 757 F. 3d 1125, 1145 (10th Cir. 2014), (two step inquiry determines whether a search by a private entity constitutes state action...1) whether the government knew of and acquiesced in the private person's conduct; and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends. Both prongs must be satisfied before a private search may be deemed governmental), *citing, United States v. Benoit,* 713 F. 3rd 1, 9 (10th Cir. 2013). Stated another way, "[U]nder the 'joint action' test...we ask whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Wittner v. Banner Health,* 720 F. 3d 770, 777 (10th Cir. 2013)

16

been afoot. Thus, *Terry v. Ohio*, 392 U.S. 1 (1961) justified a brief detention of Luis, which Clarkston did not make.  Rodriguez then failed to cooperate with the officers' investigation, contrary to Oklahoma law and Moore ordinance[6], by refusing to identify himself when he had clearly been a witness and might have been, because of his hostile demeanor and repeated efforts to get at the female (his wife), the perpetrator of whatever happened.  Finally, the arrest and seizure of Luis were supported by "probable cause" because he had assaulted and battered Moore officers, Bradley and Minard, in Clarkston's presence.  Plaintiffs have no evidence of what Clarkston is supposed to have done which amounted to "excessive" force, he was privileged to use "necessary" force to make the arrest, and the evidence is undisputed that Rodriguez continued to resist until he was cuffed, at which time Clarkston and the others stopped their efforts.  There is no evidence Clarkston deprived Luis Rodriguez of any right.

**D.     Alternatively, Clarkston was not a "state actor." Federal claims will not lie.**

Federal Constitutional claims under 42 U.S.C. § 1983 require a Plaintiff to establish "state action."  This is done by showing a defendant acted "under color of law."  *Hall v. Witteman,* 584 F. 3d 859, 864 (10th Cir. 2009)  There must be a "real nexus"

---

[6]Under FRE 201(b)(2), the Court may take judicial notice that Moore's Municipal Code requires citizens to cooperate with police officers attempting to discharge their duties and to heed any reasonable order of a police officer attempting to discharge his duties.    Moore Ordinances 10-606 (A), 10-607 and 10-608 are found at www.cityofmoore.com/Government/Codes, Ordinances and Charter. Obstructing an officer in the performance of his duty is also a misdemeanor offense under Oklahoma law. 21 O.S. § 540.

15

The undisputed evidence here is that Clarkston did not do anything to further any investigation, other than accompanying Bradley and Minard into the parking lot.  He took no action regarding Rodriguez until the Moore officers had been assaulted and battered, at which point he engaged in efforts to protect the officers present, a task which is not exclusively reserved to the State. There is nothing to show Clarkston engaged in "state action" and § 1983 claims will not lie against him.

**PROPOSITION II:  THE NEGLIGENCE CLAIM FAILS BECAUSE:  A) PLAINTIFFS' ALLEGATIONS AND THE UNDISPUTED EVIDENCE SHOW "PROBABLE CAUSE" TO ARREST MR. RODRIGUEZ AND TO USE FORCE TO DO SO; B) ALL FORCE WAS PRIVILEGED AND REASONABLE AS A MATTER OF LAW; AND, C) CLARKSTON PARTICIPATED IN HIS "OFFICIAL" CAPACITY, NOT AS A PRIVATE EMPLOYEE, AND RETAINS *SOVEREIGN IMMUNITY* TO ANY TORT THEORY ALLEGED AGAINST HIM.**

**A.      There was no "negligence." Arrest occurred with probable cause after crimes.**

Plaintiffs' allegations and the undisputed evidence show that Warren's security personnel were investigating an admitted incident of "battery" and "domestic abuse."  The officers were legally obligated to investigate and report the matter.  Plaintiffs admit that Nair Rodriguez battered her daughter and that Luis Rodriguez told all officers he did not want law enforcement involved, a choice that was not his to make.  He also disobeyed the officers' and guards' efforts to keep the parties to the incident separated and refused to cooperate by giving his ID.  (UF 11-16 ) These admissions and the undisputed evidence show that Mr. Rodriguez violated Oklahoma's statutes and Moore's municipal ordinances, establishing *probable cause* for his arrest.  Ftn. 6, *infra.*

17

With respect to Clarkston, Plaintiffs' allegations are that he went into the parking lot to investigate a report that someone in the Rodriguez family had been battered, he heard Mr. Rodriguez say he did not want "officers" involved, he observed Mr. Rodriguez refuse to cooperate with the efforts of "on duty" officers, Bradley and Minard, thereby breaking the law, establishing probable cause for arrest, and Clarkston participated in bringing Luis under control once he had assaulted Joseph Bradley and battered Ryan Minard.[7] All individuals present had a statutory duty to investigate an incident of "domestic abuse;" they could not have legally honored Luis's statement that he did not want them involved. 22 O.S. § 40.6. Ftn. 5, *infra.* Once probable cause existed, all officers present were entitled to take Mr. Rodriguez into custody. 22 O.S. § 196(1) (A peace officer may, without a warrant, arrest a person [f]or a public offense, committed or attempted in the officer's presence).

There was no "negligence" in any decision to take Luis into custody - whether as an investigatory detention or as a full blown arrest - because the undisputed evidence shows that "probable cause" for his arrest clearly existed. He had refused to cooperate

---

[7]Threatening a law enforcement officer with physical harm, such as squaring off to deliver a blow and raising arms to form fists, constitutes criminal assault in Oklahoma. 21 O.S. §§ 641 (definition of assault), 649(A)(assault of a law officer). Throwing Ryan Minard to the ground constitutes "battery" against a law officer and is a felony offense. 21 O.S. §642 (definition of battery), 649(B)(battery of a police officer is a felony offense). Even though Clarkston and Strang were allegedly "off duty," their shirts were emblazoned "Police," and they had the same powers and authorities as an on duty officer. 22 O.S. § 37.1 (An "off-duty" law enforcement officer in official uniform in attendance at a public

with officers performing mandatory statutory duties - investigating and reporting an incident of admitted "domestic abuse" - and had criminally assaulted Bradley and criminally battered Minard. There was no negligence in the decision to detain or arrest Luis Rodriguez. And, with respect to Clarkston alone, there is no evidence he made any decision regarding Luis, other than to assist in restraining him after he had assaulted Bradley and battered Minard. There is no evidence of any "negligent" conduct by Clarkston.

**B.      There was no "negligent" use of force and there was no "excessive" force.**

Once the officers had "probable cause" to arrest Mr. Rodriguez, they had the *privilege* to use the force necessary to bring him under control. There is no claim against Clarkston for "excessive force" under the Oklahoma Constitution, and one would not lie, in any event.[8] Accordingly, Oklahoma statutes and precedent will be used to analyze this issue. In Oklahoma, a law enforcement officer's touching of another, and use of reasonable force to arrest, is privileged. *Morales v. City of Oklahoma City,* 2010 OK 9, ¶¶

---

function, event or assemblage of people shall have the same powers and obligations as when he is "on-duty.")

[8]Although Plaintiffs' first Petition in Oklahoma County District Court contained an Oklahoma Constitutional claim, based on *Bosh v. Cherokee County Bldg. Authority,* 2013 OK 9, ¶¶ 17-19, 305 P. 3d 994, those claims were dismissed by the District Court in its minute order of April 30, 2015, and are not included in the First, Second or Third Amended Petitions. [Doc.1-3,¶ ¶ 87-89, 1-29,1-43,1-105] Accordingly, they have been abandoned. The pending Third Amended Petition's first two causes of action are for "excessive force" and "42 U.S.C.§ 1983" and identify only Federal Constitutional principles. [Doc.1-105,¶¶ 88-96] Even if Plaintiffs had alleged Oklahoma "constitutional"

25-29, 230 P. 3d 869.  Police officers have a "special dispensation" from the centuries old rule that one has a duty to refrain from harm-causing conduct that might otherwise arise from the relationship between a law enforcement officer and a member of the public when the officer is making an arrest.  *Id.,* at ¶ 25.  This is so because:

> exposure of the suspect to injury is an inherent part of the activity.  All arrests involve the use of some form of restraint, interference with the arrestee's liberty and the exercise of custodial control over another person.  Each of these poses some risk of harm to the arrestee. Even when an arrest occurs with minimal force, an offensive contact takes place.  **If police officers were exposed to suit every time the risk of harm inherent in an arrest culminated in actual harm, law enforcement would grind to a halt.**

*Morales,* at ¶ 25. (Emphasis in original.)  *See also, Anneler v. State,* 1951 OK CR 35, 229 P.2d 238, 239.

Admittedly, *Morales, supra,* announced an appropriate "duty" on the part of police officers: to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest.  *Id.,* at ¶ 26.  While this standard might expose the officers' governmental employer to liability for the use of inappropriate force, as discussed in Proposition I C below, since any such failure would occur "within the scope" of the officers' governmental employment, the use of force itself is "privileged."

---

theories against Clarkston, they would not lie because there are available tort claims. *See, Perry v. City of Norman,* 2014 OK 119, ¶¶ 17-19, 341 P. 3rd 689.

And, there is no evidence that any of the techniques used by any of the individual defendants at any time during the incidents at issue, and especially by Clarkston, were inappropriate under the circumstances. All officers have testified the use of force was consistent with their training. Plaintiffs cannot identify anything Clarkston did. (Ex. 1, pp. 62-4, 107-10; Ex. 4, pp. 90-1, 93, 119, 123-4; Ex. 5, pp. 227-32; Ex. 8, pp. 14-17; Ex. 9, pp. 121, 124, 138-39) Plaintiffs have admitted they know nothing of police operations, policies, training, use of force guidelines or other law enforcement related matters. There is nothing to show any use of "force" by Clarkston was inappropriate or that it occurred under circumstances which make it not privileged. The "negligence" claim fails.

**C.   Clarkston was acting in his "official capacity" as a law enforcement officer and not a private employee. He retains *sovereign immunity*.**

Plaintiffs' Third Amended Petition alleges Clarkston was "working security for the theater," as an off duty Moore officer. [Doc. 1-105, ¶¶ 18, 56, 97] Plaintiffs inconsistently allege, as is their right, that Clarkston was employed as a law enforcement officer by Moore. [Doc.1-105, ¶¶ 101, 105-107, 110-113] As with their federal theories, there is no specific allegation whether Clarkston was acting in his "official capacity" as a Moore officer, or in his "individual capacity" as a private citizen. "Official capacity," of course, is synonymous with activity occurring "within the scope of [governmental] employment." The distinction is of critical importance because if Clarkston acted in his "official capacity," he retains sovereign immunity to Plaintiffs' tort claims, the Court does not have jurisdiction over him or the claims against him; and, he is an improper party to this action.

51 O.S. §§ 152.1(A) (State adopts sovereign immunity for political subdivisions and all employees acting within the scope of their employment), 153(A) (State or political subdivision [but not employee] is liable for loss resulting from torts of employees acting "within the scope" of the employment, and liability of State or political subdivision is exclusive) and 163 (C) (suits shall name governmental employer only).

In *Pelligrino v. State, ex rel. Cameron University,* 2003 OK 2, 63 P.3d 535 Oklahoma's Supreme Court answered a certified question from the United States District Court for the Western District of Oklahoma. The specific issue was whether the notice provisions of 51 O.S. § 151, *et seq.*, applied to claims against governmental employees for conduct alleged to have occurred "outside" the scope of their governmental employment. *Id.,* ¶ 1. The Supreme Court, at ¶ 3, noted the extremely significant distinction between conduct "within" the scope of governmental employment and that which occurs "outside" the scope.

> The Governmental Tort Claims Act, GTCA, [citation omitted], makes a distinction between a government employee acting within the scope of employment and one who was not. [Citations omitted.] An act of an employee is not in the scope of employment if the *employee* acted maliciously or in bad faith. [Citation omitted.] *An employee acting within the scope of employment is relieved from private (individual) liability for tortious conduct,* but when an employee acts outside the scope of employment the political subdivision is relieved from liability. [Citation omitted.] *The concept of scope of employment is thus tied to whether the employee or government entity may be liable for a particular act.*

> *Pelligrino,* 2003 OK 2, at ¶ 3. (Emphasis added.)

22

Oklahoma's Supreme Court, at ¶¶ 4 and 5, went on to adopt the distinction between claims against an individual in his "official", as opposed to "individual", capacity. "Official capacity" refers to a person's status as a representative of a governmental entity. "Individual" or "personal" capacity can be used to distinguish "separately and personally" from official action. *Id.,* ¶ 5 Here, Plaintiffs make no allegation about the "capacity" of Clarkston. And, they allege the inconsistent positions that Clarkston was working both for Warren and for Moore, at the same time. (Doc. 1-105, ¶¶ 18, 56, 97, 101, 105-07, 110-13) Yet an allegation of "off duty" status is not sufficient to show that Clarkston was not functioning as a law enforcement officer when he: participated in an investigation of a domestic abuse crime; he observed Mr. Rodriguez's efforts to get at his wife, contrary to Strang's efforts; witnessed Mr. Rodriguez's refusal to cooperate with all officers' statutorily mandated investigation of battery and domestic abuse; and, then, participated in efforts to arrest Rodriguez after he assaulted and battered law enforcement officers.

Oklahoma's Supreme Court, in *Bosh v. Cherokee County Bldg. Authority,* 2013 OK 9, 305 P. 3d 994, discussed how there are occasions where "off duty" officers can inject themselves into an "official" event in a manner sufficient to bind their governmental employers. *Id.,* ¶ 16.

> Consequently, governmental employees such as police officers, *whether on duty or off duty,* have been held to the possibility that conduct such as striking arrestees, physically and verbally attacking customers of a private business, causing a car accident, or injuring detainees/arrestees, may have

occurred within the scope of employment subjecting their employers to liability. *Id.* (Emphasis added.)

The clearest example of such an event is *DeCorte v. Robinson,* 1998 OK 87, 969 P. 2d 358. There, an "off duty" Broken Arrow police officer, driving his personal vehicle, with his wife, after having dinner with alcoholic beverages, joined in a vehicular pursuit, stopped a speeding motorist, confronted him and used force to subdue him at the scene. *Id.,* ¶¶ 2-5. Oklahoma's Supreme Court held these facts were sufficient to show the officer's conduct established that he had been acting "within the scope" of his "official" employment, such that Broken Arrow was liable for his conduct. *Id.,* ¶ 13.

Here, the evidence shows that Clarkston entered the parking lot to investigate a report that someone in the Rodriguez family had been battered, observed Luis repeatedly trying to get around Strang as Clarkston, Bradley and Minard approached, heard Mr. Rodriguez say he did not want anyone involved, despite the fact "domestic battery" had occurred, observed Rodriguez refuse to cooperate, thereby breaking the law himself, establishing probable cause for his arrest and, finally, participated in detaining and restraining him after he assaulted Moore Officer Bradley and battered Moore Officer Minard. As in *DeCorte, supra,* these acts show that Clarkston would have been acting in his "official capacity" under Oklahoma law. Accordingly, he retains *sovereign immunity* to Plaintiffs' tort claims against him. 51 O.S. § 152.1(A) He is an improper party to this action. 51 O.S. § 163 (C). Because he retains *sovereign immunity,* the Court does not

24

have jurisdiction over him or over the tort claims against him.   As in *DeCorte, supra,* the proper Defendants would be his "official" or governmental employer.

In our case, there is no "conflicting evidence," no "disputed fact" and there is, as a matter of law, "only one reasonable conclusion that can be drawn."   This is so because the undisputed evidence shows that Clarkston was investigating a crime and arresting a person who committed crimes in his presence.   He was not selling popcorn, selling movie tickets, escorting patrons from the movie theatre or escorting an unruly patron from the screening of a film - all of which might have been "incident" to Warren Theatres' business. (Ex. 6)

Because the undisputed facts show only that Clarkston was necessarily acting in his "official capacity" as a law enforcement officer investigating admitted criminal offenses, he retains *sovereign immunity* to Plaintiffs' tort claims.   51 O.S. § 152.1.   He is an improper party to this litigation.   51 O.S. § 163 (C).   The Court does not have jurisdiction over him and he is entitled to judgment as a matter of law; or alternatively, all tort claims should be dismissed since the Court lacks jurisdiction to adjudicate the claims against him. For all of these reasons, "negligence" theories fail.

## PROPOSITION III:   CLARKSTON WAS PRIVILEGED TO USE FORCE TO BRING MR. RODRIGUEZ INTO CUSTODY.

Assault and battery occur when there is an intent to cause a perception of imminent harm, or offensive contact, to another in an "unprivileged" setting.   21 O.S. §§ 641, 642, OUJI 19.1, 19.6.   However, a law enforcement officer's touching of another, and use of

25

reasonable force to arrest, is privileged. *Morales v. City of Oklahoma City*, 2010 OK 9, ¶¶ 25-29, 230 P. 3d 869. *See,* Proposition II B, at pp. 19-21, *infra.*

Here, Plaintiffs' allegations show that Mr. Rodriguez was breaking the law when the individual Defendants began to arrest him. While a cause of action might exist against their governmental employers for the officers' "in the scope of employment" negligent use of unreasonable force, there can be no claim for "assault" or "battery" since they had the privilege to approach and touch Mr. Rodriguez as part of the lawful arrest.

**PROPOSITION IV:      "INFLICTION OF EMOTIONAL DISTRESS" FAILS SINCE THERE IS NO EVIDENCE OF "OUTRAGEOUS" CONDUCT AND PLAINTIFFS WERE NOT TOUCHED BY ANY DEFENDANT.**

### A.      There is no individual claim for emotional suffering in this case.

Title 12 Sections 1053 and 1054 of the Oklahoma Statutes establish who may bring claims for "wrongful death," and the recoverable items of damage. This Court has already determined that Nair Rodriguez is the personal representative of the Estate of Luis Rodriguez. [Doc. 96, p. 5] Only the Estate may bring claims for "emotional suffering" - the loss of consortium and grief of the surviving spouse, and the grief and loss of companionship of the surviving child. 12 O.S. § 1053(B). Plaintiffs Nair and Luinahi Rodriguez may not bring separate claims for "emotional suffering," as they have alleged in their "Tenth cause of action," because those claims belong only to the Estate. [Doc. 1-105, ¶¶ 116-119; Doc. 96, p.5 ]

### B.      There is no "outrageous" conduct by Clarkston for an "intentional infliction" theory.

26

This Honorable Court has already noted that:

> [T]o prevail on a claim of intentional infliction of emotional distress under Oklahoma law, a plaintiff must show: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. [*Citation omitted.*] To satisfy the second element, the defendant's conduct must be so extreme and outrageous as to be 'beyond all possible bounds of decency' in the setting in which it occurred, or 'utterly intolerable in a civilized community.' [*Citations omitted.*] [Doc. 96, pp. 5,6]

The undisputed facts show that Clarkston did nothing "extreme" or "outrageous." He went into the Warren Theatres' parking lot when a patron reported that a fight was occurring. He performed his statutory duty to investigate "domestic abuse." He confirmed "domestic abuse" had occurred. In his presence, others asked Mr. Rodriguez for identification, because this is normal police practice for investigating and documenting criminal conduct. He briefly helped keep Mr. and Mrs. Rodriguez separated, which is standard procedure when investigating domestic violence. He heard Moore officers tell Rodriguez he was either detained or arrested when he refused to cooperate. Clarkston then helped restrain Mr. Rodriguez after he assaulted and battered two Moore officers. There is nothing "outrageous" about such conduct.

The Court's review of the videos, submitted with this brief as Exhibit 3 - about which no factual dispute can exist - shows that the confrontation with Mr. Rodriguez was

27

short and that it ended as soon as he was cuffed and quit resisting.  There is no evidence of any conduct by Clarkston about which one might say, "Outrageous!"

**C.     Oklahoma only recognizes "intentional infliction of emotional distress" for "bystanders" under circumstances not present in this case.**

Oklahoma recognizes a separate cause of action for "intentional infliction of emotional distress" brought by a "bystander" to a tragic event, in addition to claims made in behalf of an Estate.  However, the claim can only be pursued under certain limited circumstances, which Plaintiffs cannot establish here.

*Kraszewski v. Baptist Medical Center of Oklahoma, Inc.,* 1996 OK 141, ¶¶ 1, 5-11, 916 P.2d 241 held a "bystander" may assert an intentional infliction of emotional distress claim, in addition to "wrongful death" claims asserted by an Estate.  There, Mr. and Mrs. Kraszewski were holding hands as they were walking across a grocery store's parking lot, when they were both struck by a drunk driver, who then dragged Mrs. Kraszewski across the parking lot, in front of her husband.  She died.  Wrongful death claims against the driver and health care providers were settled and the District Court entered summary judgment against the surviving husband, as a "bystander." *Id.,* ¶ 4.

The husband contended he should be allowed to recover "because he was struck by the driver's truck in the accident which led to his wife's death," in addition to "witnessing the life-ending injuries...." *Id.* ¶ 5.  Oklahoma's Supreme Court agreed.  Because Mr. Kraszewski was "a direct victim - he was part of the accident which caused his mental suffering," he was permitted to assert the claim. *Id.,* ¶ 11.  The Court recognized that the

28

drunk driver had negligently breached duties owed directly to the husband "when he negligently struck and injured him with his truck." *Id.,* ¶ 12. Under those facts and circumstances, Oklahoma's Supreme Court held Mr. Kraszewski was not a "mere bystander" but, instead, "a participant and a victim."

Here, there is no evidence either Nair or Luinahi Rodriguez was even touched by any Defendant, let alone by Clarkston. Their Third Amended Petition alleges that "the Plaintiffs, Nair Rodriguez and Luinahi Rodriguez, were directly physically involved in the incident." [Doc. 1-105, ¶ 118] But there is no evidence either one of them was touched, struck, held, slapped, placed on the ground, wrestled to the ground, bruised or impacted in any way by any conduct of an individual Defendant, and certainly not by Clarkston.

Mr. Kraszewski was struck by the motorist who killed his wife before he could make a claim as a "bystander." Because there is no similar evidence in this case, the individual Plaintiffs remain "bystanders" and do not have standing to make claims, apart from any right to recover through the Estate of Luis Rodriguez.

## CONCLUSION

Brian Clarkston is entitled to "qualified immunity" with respect to any federal claim, if he was a "state actor" - which he was not - and acting in his "individual," not "official" capacity. An "official capacity" claim is against Moore, not Clarkston. There was probable cause to detain and arrest Luis Rodriguez after he refused to cooperate in a mandatory investigation of "domestic battery;" and after he assaulted and battered Moore

officers.   Once probable cause to arrest existed, all Defendants were privileged to use force.   There is no evidence of "excessive" force.   Clarkston retains *sovereign immunity* to any tort claim for "official capacity" acts and is an improper party.   Nor can there be an "unprivileged" touching to establish assault or battery when grounds for arrest exist. Finally, Plaintiffs cannot establish "intentional infliction of emotional distress" because there is no evidence Clarkston did anything "outrageous;" and because Plaintiffs remain "bystanders" unable to recover under the theory.   Defendant Clarkston respectfully prays the Court sustain this motion and enter judgment in his favor and against the Plaintiffs.

Respectfully submitted,

s/ David W. Kirk

Michael C. Felty, OBA No. 10804
David W. Kirk, OBA No. 11386
Stacey S. Chubbuck, OBA No. 22523
Lytle Soulé & Curlee, P.C.
119 North Robinson, Suite 1200
Oklahoma City, OK 73102
405.235.7471–Telephone
405.232.3852–Facsimile
kirk@lytlesoule.com
jones@lytlesoule.com
**Attorneys for Defendant Brian Clarkston**

And

Gary J. James, OBA No. 12718
Gary J. James & Assoc., P.C.
P.O. Box 2443
Oklahoma City, OK 73101-2443
Telephone: (405) 521-9900
Facsimile: (405) 488-0529
**Attorney for Brian Clarkston,**

And

Kathryn D. Terry
kdterry@phillipsmurrah.com
Cody J. Cooper
cjcooper@phillipsmurrah.com
PHILLIPS MURRAH
Corporate Tower
101 N. Robinson Ave., 13th Floor
Oklahoma City, OK 73102
**Attorneys for Brian Clarkston**

## CERTIFICATE OF SERVICE

This is to certify that on the 16th day of March, 2017, a true and correct copy of the above and foregoing document was filed with the Court's ECF system, with service to the following:

| | |
|---|---|
| Kenyatta R. Bethea | kbethea@hbolaw.com |
| Marissa T. Osenbaugh | mosenbaugh@hbolaw.com |
| Dan L. Holloway | dholloway@hbolaw.com |
| Christopher Collins | chris@czwglaw.com |
| Ambre C. Gooch | acg@czwglaw.com |
| Erin Renegar | erenegar@wsolaw.net |
| Daniel Thompson | dthompson@wsolaw.net |
| Jordan L. Miller | jlm@czwlaw.com |

s/ David W. Kirk
Michael C. Felty/David W. Kirk

31