Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) NAIR RODRIGUEZ, AS NEXT OF
KIN TO THE ESTATE OF LUIS
RODRIGUEZ
(2) NAIR RODRIGUEZ INDIVIDUALLY AND
(3) LUINAHI RODRIGUEZ INDIVIDUALLY,

     Plaintiffs,

vs.                                   No. CIV-2016-150-D

(1) WARREN THEATRES, OKLAHOMA
(2) WARREN THEATRES, LLC
(3) BRIAN CLARKSTON,
(4) TYLER HOWSER,
(5) CHAD STRANG,
(6) THE CITY OF MOORE POLICE DEPARTMENT,
(7) JOSEPH BRADLEY,
(8) RYAN MINARD,
(9) MIDWEST REGIONAL MEDICAL CENTER,
(10) MIDWEST MEDICAL CENTER,
(11) GUY RODOLPH, AND
(12) JASON SMITH,

     Defendants

VIDEOTAPE DEPOSITION OF CHAD STRANG
TAKEN ON BEHALF OF THE PLAINTIFFS
ON FEBRUARY 13TH, 2017 AT 10:58 A.M.
IN OKLAHOMA CITY, OKLAHOMA

WORD FOR WORD REPORTING, LLC
111 HARRISON AVENUE, SUITE 101
OKLAHOMA CITY, OKLAHOMA 73104
(405)232-9673

REPORTED BY: Jessica L. Weathington, CSR

EXHIBIT
4
Clarkston

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 18

1    Q    And what is -- when do you work there?

2    A    It kind of fluctuates when I need it, but

3    usually -- usually right now I'm working some on

4    Fridays during the day.  Sometimes on Sundays.

5    Q    So right now you're working Friday during

6    the day and sometimes on Sundays?

7    A    Right.

8    Q    Is that typically over the last three to

9    four years what you've worked?

10   A    Yeah.  Here toward the last few years,

11   yeah.

12   Q    When this Rodriguez incident occurred, was

13   that what you were working was typically Fridays

14   during the day and Sundays?

15   A    Yes.

16   Q    Do you know why you were there that

17   evening?

18   A    Yes.

19   Q    Okay.  Tell me about that.

20   A    I had to switch because I had to attend

21   some continuing CLEET training that morning.

22   Q    Who did you switch with?

23   A    I don't remember.

24   Q    Did you typically know -- well, let me

25   strike that.

Page 22

1      Q     Okay.  So let's talk about the evening

2    that you -- of the Rodriguez incident.  You said you

3    came on probably around fourish?

4      A     Guessing.

5      Q     Okay.  Can you tell me before the

6    Rodriguez incident what and where you -- where and

7    what you were doing?

8      A     Got called to -- the theater had let out

9    and there was two people that were passed out in the

10   theater.  And we were working on them.  Had

11   called -- had called the on duty Moore officers come

12   because we couldn't wake them up.  And so Moore PD

13   on duty was there and the ambulance was there.

14     Q     And you said "we."  Are you talking about

15   you and --

16     A     The other two --

17     Q     -- another security guard?

18     A     Right.

19     Q     Is that Mr. Houser and Mr. Clarkston?

20     A     Yes.

21     Q     And the three of you couldn't wake the

22   people up in the theater?

23     A     Well, we shook them.  And they -- they

24   finally, after several attempts, they started coming

25   around.  But they were -- appeared to be

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 23

1    intoxicated.

2         Q    And so then what happened?

3         A    The on duty officers showed up and we let

4    them take care of it.

5         Q    Where did you and Mr. Clarkston and Mr.

6    Houser go while the on duty officers were taking

7    care of it?

8         A    As they were escorting them out, we just

9    was kind of following along behind through the --

10   through the theater.

11        Q    Was this a man and a woman?

12        A    Yes.

13        Q    What was -- were they Caucasian, Hispanic,

14   African American?

15        A    African American.

16        Q    Did these individuals get arrested?

17        A    I don't believe so.

18        Q    Were these individuals taken by ambulance?

19        A    No.

20        Q    Were these individuals allowed to drive

21   their car?

22        A    No.

23        Q    How did they leave?

24        A    I'm not sure how they left.  We got

25   interrupted before -- while that was going on.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 24

1     Q    Okay.  Fair enough.  So you're

2  interrupted.  What were you interrupted with?

3     A    Had a lady come into the lobby as we're

4  standing there and tell us there was a fight

5  occurring out in the parking lot.

6     Q    And what did you do?

7     A    Like, I asked questions.  You know, where

8  and who and went from there.

9     Q    You asked questions of the lady?

10    A    Yeah.  Yeah.  On the candid reports there

11 was an altercation.

12    Q    You have any other businesses?

13    A    I do holsters.  I make holsters on the

14 side.

15    Q    Holsters?

16    A    Uh-huh.

17    Q    Do you have any sort of personal security

18 business that you do?

19         MR. KIRK:  I'm sorry, personal what?

20         MS. OSENBAUGH:  Security.

21         MR. KIRK:  Thank you.

22         MS. OSENBAUGH:  Sorry.

23         THE WITNESS:  Personal security.  Like?

24         MR. JAMES:  Object to the form.

25         THE WITNESS:  I guess I don't know what

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

1    County District Attorney on that incident?

2        A    I did talk to one of the assistant

3    district attorneys.  I don't remember her name.  She

4    was over the juveniles.

5        Q    Sorry.  Didn't mean to talk over you.  You

6    think you gave a statement to the assistant DA in

7    Cleveland County on that incident?

8            MR. JAMES:  Object to form.

9            THE WITNESS:  I'm sure I told -- I'm sure

10        I told the story.

11       Q    (By Ms. Osenbaugh) Did you give -- did you

12   give any sort of statement to any of the district

13   attorneys in Cleveland County on this case?

14           MR. KIRK:  Through the Rodriguez matter?

15       Q    (By Ms. Osenbaugh) The Rodriguez matter,

16   I'm sorry.

17           MR. KIRK:  Thank you.

18           THE WITNESS:  No.  I never.

19       Q    (By Ms. Osenbaugh) You never talked to

20   anybody in Cleveland County District Attorney's

21   Office regarding this matter, the Rodriguez matter?

22       A    No.

23       Q    Okay.  I kind of got off my -- let's go

24   back now.  Sorry.  We're back at Warren Theatre on

25   night of the Rodriguez incident.  And I'm sorry if

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 40

1    I'm going back to where I was, but you got called

2    out of the theatre and were informed there was a

3    fight; is that correct?

4          A    Right.  Yes.

5          Q    And at that point, where are you located

6    in the theatre?

7          A    I was standing by the main entrance doors

8    on the south side of the entrance.

9          Q    Like kind of by like where you buy tickets

10   at the Warren Theatre?

11         A    Yeah.  Kind of right there by the diner,

12   if you're familiar with it.  Kind of right there by

13   the wall by the diner.

14         Q    Okay.  And were you by yourself?

15         A    I was standing there with Tyler Houser.

16         Q    Did, and you may not know the answer to

17   this, but did Tyler and Mr. Clarkston typically work

18   evenings at the Warren Theatre?

19         A    I believe so.

20         Q    So it was unusual for you to be there in

21   the evening, but not necessarily for Tyler and

22   Mr. Clarkston?

23         A    I wouldn't say unusual, but at that point

24   I was -- I liked to work the dayshift, so I usually

25   try to get the dayshift.  But I'd worked nights

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 41

1   before there on Fridays.

2        Q    Do you work nights there now?

3        A    If someone needs me to switch with them to

4   cover.

5        Q    So just on random occasions?

6        A    Right.  Yeah.

7        Q    What was the next thing, the next step

8   after you were called to the -- you were -- you said

9   you were at the south --

10       A    Right.

11       Q    -- of the ticket gate or whatever --

12       A    Right.

13       Q    By the diner.

14       A    She said there was a fight going on.

15  People punching each other in the face.  Asked

16  where.

17       Q    Let me stop you right there.  So the

18  individual -- who was this individual that was

19  telling you this, first of all?

20       A    Just a female.  I don't know her name.

21       Q    She was a -- someone that had bought --

22  was at the theatre?

23       A    I'm assuming she was a patron or customer.

24       Q    And she told you that people were punching

25  each other in the face?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 42

1       A     Yes.

2       Q     What did you do then?

3       A     Like, okay, where.  And she pointed down

4   towards the north end of the building towards the

5   IMAX entrance.

6       Q     What did you do next?

7       A     I started walking -- I walked outside

8   looking and just started walking towards the IMAX

9   entrance.

10      Q     Did you see anyone by the IMAX entrance

11  when you came out of the building?

12      A     It's a long ways.  I mean, there was

13  people, but nobody that stood out at that point.

14      Q     How did you know who you were looking for

15  at this point?

16      A     It was -- as I get a little further down

17  the sidewalk, there's a lady, another lady that's

18  leaned out beside her car parked in the fire lane

19  there.  I believe she was smoking.  And she sees

20  me -- she sees me and Tyler Houser is walking with

21  me.  And she points and says "That's her."  And

22  points towards a lady that's walking across the

23  parking lot.

24      Q     So at this point you are looking for a

25  female; is that correct?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 44

1    she's -- she's going pretty quick.  She's -- starts

2    heading towards her car and we're just trying to get

3    to her.

4          Q    So at this point you're following her?

5          A    Right.

6          Q    Correct?

7          A    Uh-huh.

8          Q    Is there people swinging at each other in

9    some various other part of the parking lot?

10          MR. JAMES:  Object to form.

11          THE WITNESS:  I didn't see anybody

12    swinging.

13          Q    (By Ms. Osenbaugh) Do you see blood or

14    screaming or yelling anywhere else in the parking

15    lot?

16          A    No.

17          Q    Okay.  So you head towards her.  Do you

18    get to her?

19          A    I do not.

20          Q    Where do you get to?

21          A    I see two other individuals coming up fast

22    behind here.  Looked to be walking aggressively like

23    they're trying to get to this person.  So I go

24    towards them and try to intervene.

25          Q    And what -- who were these individuals?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 45

1    Male, female?

2        A    It was a male and a female.  And, I mean,

3    later, I guess, it would be but Luis Rodriguez and I

4    don't know the daughter's name.

5        Q    Were they fighting, arguing when you came

6    up on them?

7            MR. JAMES:  Object to form.

8            THE WITNESS:  Not -- no.  They weren't

9        fighting each other, no.

10       Q    (By Ms. Osenbaugh) Were they speaking?

11       A    No.  They were just coming -- they were

12   just kind of walking fast towards the other lady.

13       Q    Did someone get to her or --

14       A    Tyler Houser went towards her.

15       Q    How did you even know to go to these other

16   individuals?

17       A    Just body language.  I could tell that

18   there was a disturbance and you could tell that this

19   guy was coming, looked mad and was coming fast at

20   this lady.  And so I was --

21       Q    So the man that you were approaching, was

22   his back to you or was his front to you?

23           MR. JAMES:  Object to form.

24           THE WITNESS:  His front.  It was kind of

25       45 degrees.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 46

1     Q     (By Ms. Osenbaugh) How did you know he was

2    I think you used the word angry?

3     A     He just -- he just -- you could just tell.

4    You knew that they were -- he was agitated, I mean,

5    just by the way he was walking, stomping.  And just

6    was --

7     Q     So this man who we know is Luis Rodriguez

8    and his daughter are walking across the parking lot.

9    And you perceive them to be -- you perceived him,

10   sorry, to be angry?  What -- I want to know what

11   details made you believe that?

12          MR. JAMES:  Object to form.

13          THE WITNESS:  Just got the lady that's in

14      front is moving faster than the normal flow of

15      traffic.  Got this guy moving faster than her

16      trying to catch up to him.  Just -- he didn't

17      look happy.

18     Q     (By Ms. Osenbaugh) What made you believe

19   that you needed to intervene?

20     A     That's what they pay me to be there for.

21     Q     But you agree that no one was fighting or

22   screaming or yelling or doing anything at that time?

23     A     At that time, no.

24     Q     Ms. Rodriguez, the lady that Tyler goes up

25   to --

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 47

1      A      Right.

2      Q      That we know to now, was she screaming

3   that she needed help?

4      A      I didn't hear any screaming.

5      Q      So you intervene solely based on the fact

6   that someone was walking fast across the parking

7   lot?

8          MR. KIRK:  Object to the form of the

9      question.  You can answer it, Chad.

10          THE WITNESS:  No.  I responded solely to

11      the fact that I had report of a crime that

12      occurred in the parking lot.

13      Q      (By Ms. Osenbaugh) What was the crime?

14      A      At the very least it was assault.  And it

15   ended up being domestic abuse.

16      Q      Did you arrest someone for domestic abuse?

17      A      I did not.

18      Q      Did anyone?

19      A      I don't know.

20      Q      Who did you find out did the domestic

21   abuse?

22          MR. COOPER:  Object to form.

23          THE WITNESS:  Mr. Rodriguez admitted that

24      his wife had punched his daughter.

25      Q      (By Ms. Osenbaugh) Punched his daughter?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 48

1      A    Yeah.  Hit his daughter.

2      Q    So what happened next?  You come up to

3  Luis Rodriguez and his daughter and then what do you

4  do?

5          MR. JAMES:  Object to form.

6          THE WITNESS:  I just kind of -- I'm trying

7          to slow him down because I don't know what's

8          going on.  I just see this guy coming up fast

9          trying to get to this other person.  And if

10         they were fighting, I don't want it to

11         continue, so I'm trying to keep, trying to

12         separate the parties.

13     Q    (By Ms. Osenbaugh) Do you speak to

14  Mr. Rodriguez?

15     A    I do.

16     Q    What do you say?

17     A    I don't remember verbatim.  But...

18     Q    I didn't ask verbatim.  Just tell me what

19  you remember saying.

20     A    Like, guys, what's going on, you know.

21  Have report there's a fight going on out here.

22     Q    And what does he say?

23     A    It's none of your business.

24     Q    What else did he say?

25     A    I got a report there's people hitting each

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 49

1    other out here.  He's, like, he -- he replies it's

2    a -- it's a family matter.  You know, I explained

3    that, you know, I got a report of people are hitting

4    each other.  What's going on.  After several it's a

5    family matter he -- he finally says okay.  Okay.  My

6    wife hit my daughter.

7        Q    So why, at that point, wasn't it dropped

8    with Mr. Rodriguez and his daughter?

9             MR. JAMES:  Object to form.

10            THE WITNESS:  Because this whole time he's

11       trying to step around me.  And what I think is

12       to get to -- and I don't know who's the

13       daughter and who's the mom at this point.  I

14       don't know who's -- who's --

15       Q    (By Ms. Osenbaugh) Did the daughter speak

16   to you?

17       A    No.

18       Q    The daughter never said anything?

19       A    Not that I remember.

20       Q    The daughter never confirmed that, yes, my

21   mom hit me?

22       A    I don't remember her saying that.

23       Q    You never heard her say that her mom had

24   slapped her to any of the other police officers

25   involved?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 50

1      A    I don't know what she said to the police

2  officers.

3      Q    So the only thing you recall hearing is

4  Mr. Rodriguez say to you that his wife had you said

5  hit, slapped, hit his daughter?

6           MR. JAMES:  Object to form.

7           MR. KIRK:  Object to form.  You can answer

8      it, Chad.

9      Q    (By Ms. Osenbaugh) Hit her daughter?

10     A    Yes.  His wife hit his daughter.

11     Q    That she had hit his daughter?

12     A    Yeah.

13     Q    Had it -- did -- the daughter wasn't

14  saying anything?  You didn't see any blood?  You

15  didn't see anybody crying out for help and these

16  parties were apart from each other; is that correct?

17           MR. JAMES:  Object to form.

18           THE WITNESS:  They were apart at that

19      time.  They were trying to get back together,

20      but, yes.

21     Q    (By Ms. Osenbaugh) What -- what did you do

22  next?

23     A    Once he had said that, okay, my wife hit

24  my daughter, at that point he was -- he was the very

25  least a witness to a domestic crime.  I'm like,

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 51

1    okay.  Do you guys got some ID?  Asked for both the

2    daughter and him for ID.  And he -- he refuses.

3         Q    (By Ms. Osenbaugh) What was an ID going to

4    do at this point?

5         A    One, at this point I'm out there by

6    myself, so it's just officer safety.  If I know that

7    there's a crime going on, I'm going to get their ID

8    so if I end up getting killed maybe I'll still have

9    this guy's ID as I'm laying out there in the parking

10   lot.

11        Q    So you think this guy was going to kill

12   you?

13        A    He was -- he wasn't -- he was mad.  And

14   he -- he wasn't complying.

15        Q    Did you ever say "Sir, can you just stand

16   here for a minute"?

17        A    He kept trying to step around me.  I was,

18   like, no.  I need to talk to you.

19        Q    No, no, no.  That's not my question.  Did

20   you ever ask him, "Sir, can you stand here for a

21   minute"?

22        A    No.

23        Q    Why?

24             MR. KIRK:  Now tell her.

25             THE WITNESS:  Because he kept trying to

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 52

1     stand around -- I mean, he kept trying to step

2     around me.

3         Q    (By Ms. Osenbaugh) Wouldn't it be common

4     sense though if someone's trying to step around you

5     say, "Sir, I just need you to stand here for a

6     minute while I figure out what's going on"?

7              MR. KIRK:  Objection to the form of the

8         question.  You can answer it, Chad.

9              THE WITNESS:  I don't know that it would

10        be common sense.  It's just what I did.

11        Q    (By Ms. Osenbaugh) Let's say he gives you

12    his ID and he still tries to walk around you.  How

13    did that -- what was the ID going to solve in this

14    instance?

15             MR. COOPER:  Object to form.

16        Q    (By Ms. Osenbaugh) Because you don't

17    believe he's the party that did anything, correct?

18             MR. COOPER:  Object to form.

19             THE WITNESS:  I don't know that.

20        Q    (By Ms. Osenbaugh) So you think he's the

21    one that did something wrong at this instance that

22    we're talking about at this time?

23             MR. JAMES:  Object to form.

24             THE WITNESS:  At this time I'm trying to

25        do -- throw together a little investigation to

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 53

1     find out what happened.

2          Q     (By Ms. Osenbaugh) I understand that.

3          A     So I knew, just because someone says I'm

4     not involved, don't always mean they're not

5     involved.

6          Q     I understand that, so you -- but you

7     understand that this individual said I didn't --

8     that his wife hit her and you don't -- the daughter

9     doesn't say anything.  And you're -- that's your

10    testimony that the daughter says nothing?

11         A     Right.

12         Q     So dad's just standing there trying to

13    step around you?

14         A     Right.

15               MR. COOPER:  Object to form.

16         Q     (By Ms. Osenbaugh) What happens after you

17    ask for his ID?

18         A     That's about when the two on duty Moore

19    officers arrive along with the other security

20    officer Bryan Clarkston.

21         Q     Where are you standing at?

22         A     In the parking lot.

23         Q     I'm sorry.  That was a bad question.

24    Where are you standing at with regards to

25    Mr. Rodriguez?  Are you behind him?  Are you in

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 54

1    front of him?  Are you, like how -- in his face?

2         A    I'm not in his face.

3              MR. JAMES:  Object to form.

4              THE WITNESS:  We're face to face.  And I'm

5    And I'm trying to maintain a safe distance away from

6    him, but he keeps stepping towards me trying to step

7    around me.  So there's times that we get closer and

8    I back up.

9         Q    (By Ms. Osenbaugh) Did Mr. Rodriguez raise

10   his arms at you at any point?

11        A    Not at that point, no.

12        Q    And so he says he's not going to give you

13   his ID.  Then what happens?

14        A    I'm in the process of telling him, you

15   know, he's very list a witness to the crime.  He --

16   we need to see some ID so we can figure out what's

17   going on.

18        Q    Who's the next officer that is on the

19   scene with you?

20        A    They all -- well, they all -- all three of

21   them show up at the same time.

22        Q    I'm sorry.  And just so that I am fully

23   understanding, all three of them meaning who?

24        A    The ones I said a minute ago.  Bryan

25   Clarkston and the two on duty officers.  I'm not 100

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 55

1   percent sure their names.

2        Q     Where is Tyler at this point?

3        A     He is still with the other lady at --

4   behind us.

5        Q     So the other two officers walk up, you're

6   still face to face with Mr. Rodriguez.  And then

7   what occurs?

8        A     There was three officers, the off duty --

9   Clarkston that was security and the two on duty

10  officers.  Basically they walk up and I kind of, I

11  look at them and give them the look.  You guys are

12  on duty.  It's your baby.  You know, I just -- I've

13  detained, kept the parties separated at that point

14  for them to take over the investigation.

15       Q     So do you step back, you step to the side,

16  do you run back up to the building?  What do you do?

17       A     I kind of step back.  Back off to the side

18  just a little bit.

19       Q     Okay.  Then what do you witness happen?

20       A     The officer that don't have glasses, I

21  don't know, I don't know his name.

22       Q     Well, we might as well, let's see if we

23  can identify everybody.  I think that would be

24  easier.  So we'll mark this.

25             MR. COLLINS:  Take a break if we can.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 58

1          MR. COOPER:  If you want to use that.

2          MS. OSENBAUGH:  Yeah.  Let's go ahead.  If

3     you don't mind.

4          THE WITNESS:  I don't know if it will work

5     or not.  I'm colorblind, I can't see red.

6     Q     (By Ms. Osenbaugh) Just go ahead put your

7     initials where you're at and the other individuals

8     that you know so I can have a clean record.  That

9     looks like that shows up.  Thank you.

10               Okay.  And so I want to go back for

11    just a second.  When you were asking Mr. Rodriguez

12    for his driver's license, what would you have done

13    with it when he handed it to you?  Would you have

14    gone somewhere and ran it or what were you going to

15    do with it?

16    A     When the officers showed up, I'd have

17    given it to them.

18    Q     So you were just going to stand there and

19    hold it until somebody got there?

20    A     Right.  I mean, we were trying to get

21    everything under control.

22    Q     What was out of control when you asked him

23    for his driver's license?

24    A     He had a -- kind of volatile, it seemed.

25    You know, reported a crime and Mr. Rodriguez

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 59

1   appeared to be agitated, kept trying to step around

2   me towards -- towards this other female.

3       Q    I guess I just don't -- I want to know

4   what your definition of volatile is in this

5   instance?  What was going on that was volatile?

6       A    I didn't know who the main aggressors were

7   in this fight.  I didn't want it to blow back up

8   again.  I wanted to keep everybody separated.

9       Q    But you were told it was not Mr. Rodriguez

10  by Mr. Rodriguez and his daughter didn't say "No, my

11  dad hit me," did she?

12      A    She didn't say anything.  And he -- and he

13  said that it was my wife hit my daughter.

14      Q    Did you have any reason to believe this

15  wasn't true at this point?

16      A    Just that he kept trying to get around me.

17  I was afraid he was going to go either finish

18  something or there was going be some retribution.  I

19  didn't want -- I didn't want them two to get

20  together, you know, if something would happen like

21  that.

22      Q    When you first walked out of the theater

23  to figure out what was going on --

24      A    Uh-huh.

25      Q    -- there was a lady, you said, by the car

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 60

1   you think maybe smoking that said "This is her."  So

2   what, at any point, was your indication that this

3   had anything to do with a male?

4              MR. COOPER:  Object to form.

5              THE WITNESS:  That this male was coming up

6        fast behind her to get to her.

7        Q    (By Ms. Osenbaugh) But you didn't have any

8   indication that a male had done anything wrong at

9   the point you walk out of the theater?

10             MR. KIRK:  Object to the form.

11             THE WITNESS:  I didn't know what was going

12       on when I walked out of the theater.  That's

13       why I was having to investigate to figure out

14       what was going on.

15       Q    (By Ms. Osenbaugh) Why would someone say

16  "This is her.  That's her."  Wouldn't that mean

17  that's the person that did the hitting?

18             MR. JAMES:  Object to form.

19             MR. KIRK:  Same objection.

20             THE WITNESS:  Or it could mean it was the

21       victim.  I don't know.  That's why we have to

22       investigate.

23       Q    (By Ms. Osenbaugh) Okay.  So you get to

24  Mr. Rodriguez and he says "My wife hit my daughter."

25  Did you have any reason to believe that was not

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 61

1    true?

2        A    It was just the way he was acting and not

3    cooperating, I didn't know if that was the whole

4    story or not.

5        Q    How was he not cooperating?

6        A    He kept trying to get around me to -- to

7    this other lady.

8        Q    Did you put him under arrest?

9        A    No.

10       Q    Did he have any reason not to be able to

11   walk to his car?

12       A    I was -- we were -- there was a crime that

13   had occurred and we were trying to separate the

14   parties.

15       Q    How did you know a crime had occurred if

16   you didn't see it?

17       A    Well, I had been told an assault had

18   happened.  Then at that point he had just admitted

19   that a domestic battery had occurred.

20       Q    But not by him, so you didn't detain him?

21           MR. KIRK:  Object to the form.

22           THE WITNESS:  I was keeping the parties

23       separated until the on duty officers arrived.

24       Q    (By Ms. Osenbaugh) And you were able to

25   keep them separated, correct?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 62

1      A    Yeah.

2      Q    And so then the other officers come up and

3    you step back and let them take over; is that

4    correct?

5      A    Yes.

6      Q    Then what occurs?

7      A    What you wanting?  I guess I don't know

8    what you want.

9      Q    So did Mr. Rodriguez, did you say anything

10   further to Mr. Rodriguez?

11     A    No.

12     Q    Did anybody else say anything to

13   Mr. Rodriguez?

14     A    The Moore officers started talking to him.

15     Q    And what -- what did he say?

16     A    Basically the same -- same stuff, you

17   know.  Domestic battery has apparently occurred.

18   You're a witness to that crime.  We're

19   investigating.  We're going to need everybody's IDs.

20     Q    What were you guys going to do with the

21   IDs?

22     A    At this point it was what Moore PD was

23   going to do with their IDs.  I was going to hand it

24   to them, and they were going to -- they were on duty

25   and they were going to take care of the

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 63

1    investigation at that point.

2       Q    Did you guys ask for the IDs of the

3    intoxicated people in the -- in the theater?

4       A    Yes.

5       Q    Did they gave give them to you?

6       A    I believe so.

7       Q    What did you guys do with them?

8       A    Found out who they are.  I guess -- I

9    don't know if they -- if they ran them or not.  I

10   don't know.

11      Q    Did you think that Mr. Rodriguez was an

12   illegal alien?

13      A    No.

14      Q    What were you going to -- I'm sorry.

15   Strike that.

16            So the other officers, you said, do

17   the same as you.  What -- asked for his ID again?

18            MR. COOPER:  Object to form.

19            THE WITNESS:  I don't remember what I said

20        when I said do the same.  What was that in

21        reference to?

22      Q    (By Ms. Osenbaugh) You said the other

23   officers showed up and stepped back and they talked

24   to him.  And what exactly did they talk to him

25   about?  You -- I don't know.  Maybe I lost my train

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 64

1    of thought.

2        A    Basically, again, that the crime -- they

3    explained that a crime had occurred.  He was a

4    witness to that at the very least.  And by law, you

5    know, they have to cooperate with that

6    investigation.  He, again, refused to give them ID.

7    They explained to him several times -- asked him

8    several times for his ID.

9        Q    Did Mr. Rodriguez speak clear English?

10        A    It was clear -- it was slurred.  I -- he

11    had real thick slur to his voice.  But as far as

12    English went, it was legible English.

13        Q    Do you think that he understood everything

14    that was going on?

15            MR. JAMES:  Object to the form.

16            MR. KIRK:  Object to the form.  You can

17        answer it, Chad.

18            THE WITNESS:  I don't know how I could

19        know.

20        Q    (By Ms. Osenbaugh) So you don't know if he

21    understood or he didn't understand?

22        A    Right.  I mean, he -- he knew that he

23    wanted to say no.  That's all I know.

24        Q    Well, we know now at some point other

25    things transpired after these other officers come

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 65

1    up.  So what was the next course of action that

2    happened?  Did Mr. Rodriguez, again, try to step

3    around someone?

4         A    No.  They -- officers asked him again for

5    his ID.  Explained to him again that it was an

6    investigation.  He needed to cooperate.  He refused.

7    He --

8         Q    How was he standing?

9         A    At that point he was like this.

10   (Indicating).  He -- he went to a closed up.  And he

11   was -- you could tell he didn't -- he didn't want to

12   be there.  The officer explained to him, you know,

13   if you don't cooperate, we're going to be forced to

14   place you under arrest.  And that's -- that's when

15   Mr. Rodriguez stepped back to a stance like this

16   (Indicating).

17        Q    Stepped back away from the officers?

18        A    Spread his feet in kind of a boxer stance

19   when I say he put one foot back, kind of like you're

20   loading up to throw a punch.

21        Q    Did he actually ever raise his arms?

22        A    Not at that point, no.

23             MR. JAMES:  Object to form.

24             THE WITNESS:  I mean, when you say raise,

25        I don't --

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 66

1      Q      (By Ms. Osenbaugh) Did -- I mean, you say

2    that he was standing in a -- sorry, in a boxer pose.

3      A      I mean, he did, he came up, I guess, he

4    raised them up to a fighting stance.

5      Q      So you're testifying today that he put his

6    hands in a fighting stance like this (indicating)

7    like he was going to fight?

8      A      Like this.  (indicating).

9      Q      And so if nobody else has testified to

10   that, that's just what you recall?

11           MR. KIRK:  Object to form.

12           MR. JAMES:  Object to form.  And I object

13           to your characterization of what he's doing

14           because it wasn't the same thing.  So I -- even

15           though we've got a video, I'm objecting for the

16           written record.  Your characterization was

17           different than his.

18           MS. OSENBAUGH:  That's good.  That's

19           perfect.  Object to the form.  I got it.

20      Q      (By Ms. Osenbaugh) Sir, would you, please,

21   for the video sake, show where his arms were, in

22   your mind, at the time that she stepped back from

23   the officers?

24      A      (Witness complies).

25      Q      So you're saying that they were higher

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 67

1    than his waist?

2        A    Somewhere in there.  All I really remember

3    seeing is clenched fists and this guy's fixing to

4    throw a punch.

5        Q    Have you watched the surveillance video?

6        A    Just on the news.

7        Q    How did you feel about that video when you

8    saw it?

9             MR. KIRK:  Just a minute.  Object to the

10        form.  Which video are we talking about?

11             MS. OSENBAUGH:  The surveillance video

12        from Warren Theatre.

13             MR. KIRK:  Thank you.

14        Q    (By Ms. Osenbaugh) Have you watched the

15    surveillance video from Warren Theatre?

16        A    Yes.

17        Q    How did you feel about that video?

18             MR. KIRK:  Object to the form.  Vague.

19        You can answer it, if you can, Chad.

20             THE WITNESS:  I felt it was poor qualify.

21        Not very clear.

22        Q    (By Ms. Osenbaugh) Did you see the video

23    that Nair Rodriguez had taken at the scene of the

24    incident?

25        A    Yes.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 68

1      Q     What did you think of that video?

2            MR. KIRK:  Same objection.  You can answer

3      it, Chad.

4            THE WITNESS:  I don't know what you -- I

5      don't know what I think about it.

6      Q     (By Ms. Osenbaugh) Was it a fair depiction

7      of the scene of events that occurred?

8      A     It was a thin slice of time that it was on

9      video that was kind of taken out of context, I

10     believe.

11     Q     Okay.  So why did you think that

12     Mr. Rodriguez was going to throw a punch?

13           MR. COOPER:  Object to form.

14           THE WITNESS:  Again, he -- he had his fist

15     clinched and was standing in a fighting stance.

16     Q     (By Ms. Osenbaugh) What occurred next?

17     A     One of the officers reached for his hand,

18     we saw it balled up.  And I don't know -- I don't

19     know what he was doing.  If he was going to try to

20     put him in an arm bar or try to control that hand so

21     he doesn't hit the other officer.

22     Q     Did Mr. Rodriguez swing at any of the

23     officers?

24     A     Not -- no.

25     Q     So this officer grabs his arm for some

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 69

1    reason.  You don't know why; is that correct?

2        A    If I had been closer, I would have grabbed

3    it so he wouldn't have been able to throw it.  I

4    would have got control of that arm so he wouldn't be

5    able to throw the punch.  But I wasn't close enough

6    and that officer did what he needed to do.

7        Q    But you agree he wasn't swinging his arms?

8        A    Well, once a swing starts, it's hard to

9    stop it so you try to get them stopped before they

10   --

11       Q    That's not my question.  Did you see

12   Mr. Rodriguez swing his arm at any officer at any

13   point?

14       A    No.

15       Q    So the officer grabs his arm.  You don't

16   know why, correct?

17            MR. KIRK:  Object to the form.  That's not

18       what he said.

19            THE WITNESS:  I know why.

20       Q    (By Ms. Osenbaugh) Well, you said -- no.

21   Let's clarify here because you've said two different

22   things now.  You said you might have done that.  But

23   you also said you're not sure or why or how he did

24   it.  You said something about an arm bar or you

25   don't know what?

Chad Strang                                    Nair Rodriguez vs. Warren Theatres et al.
February 13, 2017                                         Case No. CIV-2016-150-D

Page 70

1        A     I said I didn't know what technique --

2              MR. COLLINS:  Object to the form.

3              THE WITNESS:  What technique he was going

4        to use.  If he was just going to hold him to

5        keep him from throwing a punch or if he was

6        going to use an arm bar and take him --

7        Q     (By Ms. Osenbaugh) What occurred then?

8              MR. KIRK:  Just a minute. were you

9        finished with your answer?  Were you finished

10       saying what you were going to say?

11             THE WITNESS:  Yeah.  I didn't know if he

12       was going to take him to the ground or what.

13       I'm done.

14       Q     (By Ms. Osenbaugh) Okay.  What occurred

15       then?

16       A     Mr. Rodriguez basically yanked his arm

17       back and pulled that officer off his feet.  Kind of

18       pulled him up in the air.  And kind of spun around

19       with him.  And they went running, falling across the

20       parking lot kind of a deal.

21       Q     So your testimony is that this officer

22       went flying in the air?

23       A     He was --

24             MR. COOPER:  Object to form.

25             THE WITNESS:  His feet were off the

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 71

1        ground.

2        Q      (By Ms. Osenbaugh) Then what -- what did

3    the rest of you do at this point?

4        A      Ran to their location when they hit the

5    ground to try to get -- get the suspect under

6    control.

7        Q      Now he's a suspect?

8        A      Well, he just assaulted an officer.

9        Q      So a witness -- you said that he was a

10   witness.

11       A      Uh-huh.

12       Q      Why did the officer need to touch him?

13              MR. COOPER:  Object to form.

14              THE WITNESS:  Because he was -- had his

15              hands in a fighting position and for officer

16              safety, he was going to get him under control

17              for -- before anything happened.  And, you

18              know, he was not -- he was refusing to comply

19              with investigation.

20       Q      (By Ms. Osenbaugh) Was there not any other

21   way that you could have used to get the situation

22   under control?

23              MR. KIRK:  Object to the form.

24              MR. JAMES:  Object to the form.

25              MR. KIRK:  You can answer it, Chad.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 77

1    Q    Did someone pull out a gun?

2    A    No.

3    Q    So one of the Moore police officers,

4  again, you don't know -- do you know which one in

5  this picture that grabbed his arm?

6    A    It would be this one with the ball cap and

7  glasses.

8    Q    What happened next after he and

9  Mr. Rodriguez moved from the parking lot?

10   A    They -- they fell to the ground.  And I'm

11 not sure what everybody else did.  I know I ran over

12 there to assist that officer that was on the ground

13 with the -- with Mr. Rodriguez.

14   Q    What did you do?  Did you help the officer

15 to his feet?

16   A    No.  Mr. Rodriguez was actively resisting.

17 Rolling around, kicking, trying to get up like he

18 was trying to run.

19   Q    So what did you do?

20   A    When he landed, he had his right arm under

21 him.  So I ran up to his right side and proceeded to

22 try to get his right hand out from under him so we

23 could place him in handcuffs.

24   Q    Did you get him in handcuffs?

25   A    No, I did not.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 78

1      Q      Do you know what any of the other officers
2  were doing?
3      A      No.   I mean, other -- common sense would
4  say they were trying to get him in handcuffs.
5                         (Exhibit 1 was marked for
6                          identification).
7      Q      (By Ms. Osenbaugh) It appears in this
8  picture, and you've identified yourself in
9  Plaintiff's Exhibit Strang 1 as the individual here
10 that has Khaki pants on, that's correct?
11     A      Uh-huh.
12     Q      It appears in this picture that you're
13 hands are holding his face down.  Is that accurate?
14     A      He was raising his head up and down
15 hitting it on the concrete trying to get up, so I
16 stabilized his head from being able to raise up.
17 Keep him from getting up.
18     Q      There's four other officers and it was
19 necessary to hold his head down, correct, into the
20 pavement?
21     A      He was still actively getting up at that
22 point.
23     Q      Did anybody get him in handcuffs?
24     A      Eventually, yes.
25     Q      How long did you hold his head down like

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 79

1    that?

2         A    I stabilized his head as long as it took

3    for them to get his cuffs on him, once I was in that

4    position.

5         Q    And was his face bloody?

6         A    His face was turned away from me.

7         Q    Did he ever turn his head the other

8    direction?

9         A    I never -- I don't remember seeing his

10   face.

11        Q    Well, did you see his face afterwards when

12   he sat up?

13        A    No.  Because he was -- he was actually

14   leaned up against my leg looking away from me.  I

15   never seen his face.

16        Q    So you didn't see his face during the time

17   that you were holding him down?  You didn't see his

18   face afterwards?

19        A    I seen him in the ambulance, but --

20        Q    Okay.  Do you recall if his face was

21   bloody?

22        A    No.

23        Q    Would there be a reason why his face would

24   be bloody?

25             MR. JAMES:  Object to form.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 80

1          THE WITNESS:  Because before I was

2      stabilized his head, he was, like I said,

3      raising up.  His head kept coming up and back

4      down on the concrete as he was trying to get

5      put.  It was like he was head butting the

6      concrete.

7          Q     (By Ms. Osenbaugh) Well, if you were

8      stabilizing his head on the concrete, how was his

9      head butting the concrete?

10          MR. COOPER:  Object to form.

11          THE WITNESS:  That was before I got into

12      that position.

13          Q     (By Ms. Osenbaugh) So he was head butting

14      the concrete and then you pushed his face down and

15      held it there?

16          A     I stabilized it where he couldn't raise it

17      up.

18          Q     Did you ever hit or kick Mr. Rodriguez?

19          A     No.

20          Q     Did you ever deliver knee strikes to the

21      left side rib area?

22          A     I deliver knee strikes.  I don't believe

23      they were to the rib area.  Kind of upper shoulders

24      is where I was aiming.

25          Q     Why did you need to deliver knee strikes

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 81

1   period?

2       A    The struggle.  Him resisting had been

3   going on for quite a while.  And when I turned

4   around and seen they were still fighting, went back

5   to get his left arm, which was up underneath him.

6   And didn't know what he was -- what he had under him

7   or what he was doing.  And in order to get him

8   handcuffed, I needed that arm.  So I tell him "Give

9   me your left arm."  He doesn't comply.  I gave him a

10  knee strike.  Purposely avoiding the ribs, because I

11  was like, I didn't want to break this guy's ribs.

12  And give him a knee strike.  I gave him another

13  command.  "Give me your left arm."  Doesn't give me

14  his left arm.  I deliver another knee strike.

15             Again, I give him another command,

16  "Give me your left arm."  He gives me his left arm.

17  I place it behind his back and push it back and then

18  I hold it back there while they're handcuffing him.

19      Q    How many total officers were on the scene

20  at this point?

21      A    All the ones in the picture.

22      Q    How many?

23      A    Five.

24      Q    Five officers?

25      A    Uh-huh.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 82

1     Q   And so it -- in addition to the five

2  officers, it also took you giving him knee strikes

3  while he's pinned down; is that correct?

4     A   Yes.

5     Q   And you say that you didn't give it to the

6  rib area.  If there's other statements and testimony

7  that you did deliver knee strikes to the rib area,

8  then that would be inaccurate?

9     A   I was -- I wasn't aiming for the rip area.

10  I was aiming -- I was trying to aim more shoulder

11  blade right in there.  That's where I was aiming.

12     Q   As you sit here today, do you still

13  believe the knee strikes were necessary at this

14  moment?

15     A   Yes.  They -- he -- he, after the two, he

16  did give me his left arm.  And we was able to get

17  them behind him to get him handcuffed.

18     Q   When you watched the video that Nair

19  Rodriguez filmed at the scene, did you believe that

20  those knee strikes were necessary in the moment?

21     A   I didn't see any knee strikes on her

22  video.

23     Q   Did you see any officers hit Luis

24  Rodriguez?

25          MR. JAMES:  Object to form.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 83

1          THE WITNESS:  I -- I did.  I did see an

2     officer.

3          Q    (By Ms. Osenbaugh) Can you identify which

4     officer it was?

5          A    Yes.  It's going be this other -- this guy

6     here.

7          Q    And where --

8          MR. KIRK:  For the record, the witness is

9     pointing to the officer to Mr. Rodriguez's

10    right and closest to his head area in Exhibit

11    1.

12         Q    (By Ms. Osenbaugh) Where did you see --

13    you don't know who this officer is; is that correct?

14         A    No.  He was one of the on duty guys.

15         Q    And did you see where he hit

16    Mr. Rodriguez?

17         A    Yes.

18         Q    Where did he hit him?

19         A    Kind of in the forehead.

20         Q    Did you think that that was in excess of

21    what needed to happen at the moment?

22         A    No.

23         Q    Why not?

24         A    I was -- at this point, I wasn't -- when

25    he's do the hitting, I'm standing over here keeping

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 84

1   the wife back, so I turn around and he -- he is more

2   up here.  Guy's got his, Mr. Rodriguez has got both

3   his hands underneath him.  And he's trying to get

4   his arms out.  Again, don't know what he's got under

5   him in his waistband.

6              I seen him deliver, I -- I think it

7   was two just real quick little bitty.  They weren't

8   even -- didn't look very hard at all.  Just two

9   little rabbit punches in the forehead telling him,

10  "Give me your hands."  Pop.  And then I turned back

11  around, because Mrs. Rodriguez was screaming, so I

12  -- my attention was diverted back to her.

13       Q    Why -- you keep saying something about the

14  waistband.  Was there some reason that you guys

15  believed he had a weapon?

16       A    No.

17       Q    Did you see a weapon?

18       A    No.

19       Q    Did he ever indicate that he had some sort

20  of weapon on him?

21       A    No.

22       Q    Was that the only time that you saw an

23  officer hit Mr. Rodriguez?

24       A    Yeah.  Those two little punches.

25       Q    Well, this is -- I'll mark this as and

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 90

1        misleading and inaccurate.

2            MS. OSENBAUGH:  And you can object --

3            MR. KIRK:  No.  I'm not instructing him to

4        do anything.  I'm asking you to stick to the

5        evidence in the case and not make up stuff,

6        Mrs. Osenbaugh.

7            MS. OSENBAUGH:  I'm not making anything

8        up.

9            MR. KIRK:  You are making something up.

10       None of these pictures show any officers on top

11       of your client's deceased husband.  They're

12       holding him down.

13           MR. JAMES:  Or kicking him is my

14       objection.

15           MR. COOPER:  To be clear, is Exhibit 3 the

16       same as Exhibit 1?

17           MS. OSENBAUGH:  No.

18           MR. COLLINS:  Can we see it?

19           MR. COOPER:  Can we see a copy?

20           MR. KIRK:  The question, Mr. Strang, is

21       why would five officers need to kick or hit

22       Mr. Rodriguez.  And then Ms. Osenbaugh contends

23       while the officers were on top of

24       Mr. Rodriguez.

25           THE WITNESS:  Officers would use pain

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 91

1    compliance to get this -- get the subject to

2    comply where they can get him in handcuffs

3    would be the only reason they would hit him.

4    Anyone would hit or kick a subject.

5        Q    (By Ms. Osenbaugh) I'm sorry to go

6    backwards, but I don't think I asked you this.  When

7    Mr. Rodriguez stepped back with his hands clenched,

8    was that the only thing that occurred that caused

9    you to think that he was being aggressive?

10           MR. JAMES:  Object to form.

11       Q    (By Ms. Osenbaugh) And that's my word, not

12   yours, so I apologize.  You kind of had told us

13   earlier that you thought he might punch someone?

14       A    Right.

15       Q    Okay.  I'm not trying to put words in your

16   mouth, but is there any other mannerisms or things

17   that he did that caused you concern at that point?

18   And this is before you -- they went to the ground.

19           MR. JAMES:  When you say -- I object to

20           the point right when it happened or all the

21           facts that leading up to the happening.

22           MS. OSENBAUGH:  No.  Just right -- I'm

23           just talking about when he steps backwards.

24           THE WITNESS:  I just -- to me, that's a

25           clear, we're fixing to fight stance is what

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 92

1       that was.

2            Q     (By Ms. Osenbaugh) I just want to clarify,

3       though.  You did not see him swing his arms?

4            A     No.  I mean, other than when the officer

5       had ahold of him.  He swung the officer around.

6            Q     So every time that you were in a situation

7       where an individual stepped backwards, in your

8       experience and you would take it that they're going

9       to fight?

10                 MR. JAMES:  Object to form.

11                 THE WITNESS:  If someone takes a fighting

12            stance, I usually feel that they're wanting to

13            fight.

14            Q     (By Ms. Osenbaugh) Did you ever ask

15       Mr. Rodriguez what his name was?

16            A     I didn't, no.

17            Q     Did you ask him any other questions

18       regarding the incident that had been reported to

19       you?  We know that you asked for his ID, but did you

20       say, "Man, tell me what happened?  What's going on?"

21            A     Yeah, I did.

22            Q     And what --

23            A     That's when he was like, it's a family

24       matter.  No.  Something happened because we got a

25       report that people are being hit out here.  That's

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 93

1    when he said, okay, okay.  My wife hit my daughter.

2         Q    Did you ask any other questions inquiry or

3    --

4         A    No.

5         Q    Why?

6         A    Because that's about the time that the

7    other officers that were on duty were walking up, so

8    I was letting them take it over.

9         Q    Did anybody else investigate and ask

10   questions?

11        A    They were -- they were trying to.  He

12   wasn't --

13        Q    What did they try to ask?

14        A    Well, they explained to him --

15        Q    Besides for an ID, sorry.

16        A    Well, basically that's as far as they got.

17   You know, that's, you know, first part of the

18   investigation figure out who they're talking to.

19   And never was able to get past that.

20        Q    So really no other questions were asked

21   besides his ID?

22             MR. KIRK:  Object to the form.  You can

23        answer it, Chad.

24             THE WITNESS:  Not that I remember.

25             MR. JAMES:  I think that's a

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 96

1          MR. COOPER:  Object to form.

2      Q    (By Ms. Osenbaugh) -- at the time that he

3  steps back?

4      A    I just -- I didn't know who he was

5  fighting.  I just knew he was in a fighting stance.

6      Q    He wasn't facing his daughter, though,

7  correct?

8      A    No.

9      Q    Did any of the officers talk to his

10 daughter when they walked up?

11     A    I don't remember.  I don't think so.

12     Q    Was his daughter yelling or talking or

13 screaming at the time that the other officers walk

14 up or thereafter?

15     A    I don't remember any yelling or screaming.

16     Q    You had mentioned earlier in the depo,

17 though, that you did recall Nair yelling and

18 screaming when she walked up?

19          MR. COLLINS:  Object to form.

20          THE WITNESS:  Earlier I was talking about

21     when it was on the ground.

22     Q    (By Ms. Osenbaugh) Okay.  So let's go back

23 to that.  You said that you stopped what you were

24 doing because she was screaming?

25     A    Yes.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 97

1      Q      Okay.  What did you do?

2      A      Once they hit the ground the first time

3   and I was trying to get his right arm, that's when

4   the -- turned out to be the wife come running up.

5   She's reaching in her purse.  I just happen to look

6   up.  She's reaching in her purse.  So I -- they kind

7   of, the whole pile kind of pushes past me and I

8   stand up to go make sure she's not going to pull a

9   weapon and keep her back.  Just basic domestic abuse

10  case, you know.  Keep -- keep them separated.

11              Didn't want the -- didn't want her to

12  come over there and start hurting officers.  So I'm

13  keeping her back.  And she -- of course, she's --

14  she's yelling and screaming but mainly at him.  And

15  --

16     Q      What is she saying?

17     A      She -- she just keeping saying Poppy.

18  What I -- what I remember the most.

19     Q      But then -- then you go back and put your

20  hand back on his head after that?

21     A      After that I go and turn around and they

22  still haven't got it -- they're still -- he's still

23  resisting.  You know, they're still telling him,

24  stop resisting.  Trying to get -- they don't have

25  any of his hands behind his back to get him in the

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 98

1    handcuff position at that point.

2              So I feel that she -- she hadn't

3    pulled a weapon.  And we need -- this -- we need to

4    get this guy, hurry up and get him in handcuff to

5    get the situation calmed down.  So I did go back.

6    And then I did get back in basically that position

7    where I'm stabilizing his head because that's when I

8    noticed he was raising his head up.

9         Q    You didn't think that the other four could

10   handle it?

11        A    Well, they hadn't got him under control at

12   that point.

13        Q    What was Tyler Houser doing to help in

14   this situation?  In -- I'm sorry.  I'll refer to

15   Plaintiff's Exhibit 3.  Where's he at and what's he

16   doing?

17        A    I -- he's back here at the -- at the back.

18   And I can't -- I don't know what he's doing.

19        Q    And what about Mr. Clarkston, where he's

20   at in Plaintiff's Exhibit 3?

21        A    He's right next to me.  And -- and that

22   picture, he's trying to connect the two handcuff --

23   they got -- they got a set of handcuffs on each of

24   Mr. Rodriguez arms at that point.  We're trying --

25   he's still fighting.  We're trying to get his arms

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 99

1    back so we can hook the handcuffs together.

2         Q     Did you ever see Mr. Houser or

3    Mr. Clarkston hit or kick Mr. Rodriguez at any time

4    during this incident?

5         A     No, I did not.

6         Q     Would you agree that if you're in the

7    field as an officer and you see other officers doing

8    something inappropriate that you have a right to

9    stop those officers?

10        A     Yes.

11        Q     Would you do that?

12        A     If it was something I don't agree with,

13   absolutely.

14        Q     So after the handcuffs go on to

15   Mr. Rodriguez, what do you do next?

16        A     We all start coming off from around the

17   side of him.  You know, everybody's backing off.  He

18   starts trying to raise up again.  See his head come

19   up, so I -- I transition into what they call a three

20   point stabilize position that they teach you.  And

21   basically I just -- I'm down there in just kind of

22   monitoring him.  He's -- make sure he's not going to

23   get up.  Everybody else is catching -- we're all

24   just catching our breath and everything.

25        Q     Would it be unusual for an individual to

Chad Strang .
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 100

1   lift their head to try to breathe?

2           MR. JAMES:  Objection to form.

3           THE WITNESS:  His whole body was coming

4       off the ground.

5       Q    (By Ms. Osenbaugh) He's handcuffed at this

6   point, though, correct?

7       A    Right.

8       Q    So what -- what is it that you thought he

9   was going to do?

10      A    Well, there's, you know, I didn't know

11  what he was going to do.  I didn't know if he was

12  going to go back to bashing his head in the concrete

13  or if he was going to get --

14      Q    He was bashing his head in the concrete?

15      A    When he was head butting it earlier.  The

16  reason I had to stabilize his head earlier when I

17  got over there.  And either that or, you know, get

18  up or, you know, you never know.  They can still

19  kick and spit and everything else while they're

20  handcuffed.

21      Q    So he's laying on his stomach with the

22  handcuffs on?

23      A    Yes.

24      Q    And what kind of maneuver do you put on

25  him?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 101

1      A    I don't put a maneuver on him.  I just --

2    basically I just I transition where my left knee is

3    kind of resting up above the point of his shoulder

4    like right here.  (Indicating).

5      Q    And that was necessary to prevent him from

6    kicking or spitting?

7      A    Well, it keeps him from raising up.  I

8    wasn't putting any pressure on him.

9      Q    Did you check to see if he was breathing?

10      A    He was breathing.

11      Q    How do you know?

12      A    I could see him breathing.

13      Q    You testified earlier you couldn't see his

14    face.

15           MR. COOPER:  Object to form.

16           THE WITNESS:  I could see him, his chest

17    up and down.

18      Q    (By Ms. Osenbaugh) Then what did you do?

19      A    I -- he start -- he takes a couple real

20    deep breaths.  And I patted him on the back, I'm

21    like, just calm down, dude.  Just take some

22    breathes.  I look up at the other officer, like,

23    hey, let's roll this guy over into the recover

24    position.  And they came over, we set him up

25    where -- where he's not laying down.  And that's

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 102

1    about when the ambulance is arriving.

2         Q    And why was the ambulance there?

3         A    I'm -- I'm assuming it's a Moore PD

4    policy.  Because as soon as -- as soon as we got him

5    in handcuffs, they were calling for a supervisor and

6    medical, since I -- I guess if any force was used.

7    They called them.  They were already in the parking

8    lot for the other deal, so...

9         Q    You said I guess if any force was used?

10        A    Right.

11        Q    The Moore supervisor was called?  The

12   Moore Police Department supervisor was called?

13        A    Uh-huh.  Yeah.

14        Q    Was he called because they were going to

15   see if any excessive force was being used?

16        A    No.  Any time -- I'm not -- I don't know

17   their policies, so I'm not really qualified to even

18   speak on that, I don't think.

19        Q    Did you do a incident report for Warren

20   Theatres?

21        A    No.

22             VIDEOGRAPHER: Is it okay if we take a

23   break in a minute?

24             MS. OSENBAUGH:  Is it about time?  Okay.

25        Yeah.  We can take a break.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 106

1      A      Yeah, three point position.

2      Q      At some point did you talk to

3  Mr. Rodriguez to make sure he was okay?  Did you say

4  anything to him?

5      A      I did.  Like I said, when he was --

6  earlier I said he started taking some deep breaths

7  and I patted him on the shoulder and told him just

8  calm down.  Take some -- take some deep breaths.

9  Relax.  And then that's -- that's when I told the

10  other officers, hey, let's roll him over in the

11  recovery position.

12      Q      Did you and Mr. Clarkston have any type of

13  conversation about the length of time that

14  Mr. Rodriguez had been laying face down?

15      A      No.

16      Q      Did you indicate to Mr. Clarkston that you

17  thought Mr. Rodriguez was playing possum?

18          MR. KIRK:  I'm sorry, that he was what?

19          MS. OSENBAUGH:  Playing possum.

20          THE WITNESS:  Later on, yes.

21      Q      (By Ms. Osenbaugh) What does that mean?

22      A      I mean, I don't know what point in time

23  we're talking about now.  Is this like when we roll

24  him over or what?

25      Q      So he's laying face down with handcuffs

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 107

1    on.  You said that you didn't have a conversation

2    with Mr. Clarkston at that point?

3         A    That's -- I had a conversation.  Said,

4    hey, let's roll him over into the recovery position?

5         Q    And why did you do that?

6         A    Just training.  That's -- that's what

7    you're supposed to do.

8         Q    So you roll him over.

9         A    Uh-huh.

10        Q    And what -- what's Mr. Rodriguez doing?

11        A    He's sitting there.  He's, you know, he's

12   a big guy so instead of, I was trying to be nice to

13   him instead of trying to let him hold himself up.

14   I'm standing here.  You can lean up against me, so I

15   just let him lean up against my legs.  It's a lot

16   easier to lean up against a wall than it is to try

17   to hold yourself.

18        Q    Could you see his face?

19        A    No.

20        Q    What was his demeanor?

21        A    He was just quiet.  He wasn't -- nothing.

22   He was just kind of just there.

23        Q    Did he speak?

24        A    No.

25        Q    Did you speak to him?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 117

1   guys asked for an ID and you asked him -- what else

2   did you ask him?  I don't remember now.

3           MR. JAMES:  Object to the form.

4           MR. KIRK:  Object to the form.  That's not

5       all that he's told you.

6       Q    (By Ms. Osenbaugh) What else -- I want to

7   know exactly today the questions that you asked

8   Mr. Rodriguez.

9           MR. KIRK:  Objection.  Asked and answered.

10          MR. JAMES:  It's been asked and answered

11      about eight times.

12          MR. KIRK:  Yeah.  You can answer it again,

13      if you can, Chad.

14          THE WITNESS:  Yeah.  That -- not being

15      verbatim, but yeah.

16      Q    (By Ms. Osenbaugh) Yeah.  I just want to

17  make sure I have all of them.

18      A    Yeah.  Asked what's going on.  He was --

19  he -- you know, he wouldn't answer.  Personal,

20  personal matter.  All that -- all that stuff.  Asked

21  several times.  Had report there's a -- someone was

22  hit.  He admitted that there had been a crime.  At

23  that point I asked for ID.  And asked for a couple

24  times for ID.  Then turned it over and I never asked

25  him anymore question.

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 119

1      Q      -- in Strang Exhibit 1?

2      A      Yes.

3      Q      Plaintiff's Exhibit 1.

4      A      Yes.

5      Q      Were you concerned about him being able to

6   breathe because of the pepper spray?

7      A      No.

8      Q      Would you agree that your memory is better

9   the morning after this incident occurred as we sit

10  here today?

11     A      Yeah.  I mean, I guess.

12     Q      If you told the -- the Moore Police

13  Department something along the lines of we don't

14  need to leave him laying on it, we need to roll him

15  up so he can breathe.

16     A      That's talking about the recovery position

17  that we talked about earlier.

18     Q      So you were concerned about getting him

19  into the recovery position --

20     A      Right.

21     Q      -- to make sure he could breathe?

22     A      Right.  That's just part -- part of the

23  training.

24     Q      You didn't know the Rodriguez family prior

25  to this incident, did you?

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 121

1                    (Brief Recess).

2                    VIDEOGRAPHER:  We are back on the record.

3        Q    (By Ms. Osenbaugh) Mr. Strang, do you have

4    any medical training?

5        A    Medical?

6        Q    Paramedic, EMT?

7        A    No.

8        Q    And so as far as what his condition was or

9    what they did or didn't do, you wouldn't have any

10   knowledge of that?

11       A    None at all.

12              MS. OSENBAUGH:  I'm not going -- I'll pass

13           the witness.

14              MR. KIRK:  I have -- I'll start with just

15           a few.

16                  CROSS-EXAMINATION

17   BY MR. KIRK:

18       Q    Chad, you were asked about the events when

19   you came up and first started speaking to

20   Mr. Rodriguez before Bryan Clarkston and the two

21   Moore officers came up to join you.  When you spoke

22   to Mr. Rodriguez did he hesitate in responding to

23   your questions?

24       A    No.

25       Q    Did he answer you directly?

Page 122

1      A      Yes.

2      Q      Did he ask you to repeat anything you said

3   to him?

4      A      No.

5      Q      Are there Spanish language movies shown at

6   the Warren Theatres?

7      A      Not that I have seen.

8      Q      Okay.  Do you recall whether there was a

9   Spanish language movie being shown on the night of

10  this evening?  The night of this incident, I'm

11  sorry.

12     A      Not that -- no.

13     Q      So would you conclude that Mr. Rodriguez

14  had been to an English speaking movie that evening?

15     A      Yes.

16            MS. OSENBAUGH:  Object to the form.

17     Q      (By Mr. Hosy) Did you see anything at all

18  in his response to you or his behavior that led you

19  to even suspect that he had the slightest difficulty

20  in your remarks to him?

21     A      No.

22     Q      There was a -- there were a couple of

23  questions about when the struggle was occurring and

24  Mr. Rodriguez was on the ground.  Another officer

25  threw a couple of rabbit punches.  What do you mean

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 123

1    by "rabbit punch"?

2        A    Just real short.  I mean, just not much

3    power.  Just about, you know, about that far.

4    (Indicating).

5        Q    You were asked, I believe, if there was

6    anything about those punches that you thought was

7    appropriate or inappropriate.  Do you have a view on

8    whether those punches were inappropriate?

9        A    No, not at all.

10       Q    And in your mind did they appear to be

11   sufficient to be a compliance technique?

12            MS. OSENBAUGH:  Object to the form.

13            THE WITNESS:  Through training I would say

14       that they needed -- they weren't hard enough to

15       actually get any compliance.

16       Q    (By Mr. Kirk) Okay.  And, in fact,

17   Mr. Rodriguez continued to resist after those rabbit

18   punches were landed, correct?

19       A    Right.

20       Q    So they apparently were not successful in

21   getting him to comply with any command, right?

22       A    Right.

23       Q    At anytime during the incident at issue

24   did you tell another officer present whether a

25   security guard or a Moore officer that you thought

Chad Strang
February 13, 2017

Nair Rodriguez vs. Warren Theatres et al.
Case No. CIV-2016-150-D

Page 124

1    they were doing something inappropriate?

2        A    No.

3        Q    And was that because you thought that all

4    actions appeared to be appropriate in light of the

5    challenges confronting you?

6        A    Yes.

7        Q    You have personally been involved in an

8    incident where a person tried to grab your service

9    weapon, haven't you, sir?

10       A    Yes.

11       Q    Did that frighten you?

12       A    Absolutely.

13       Q    You were wearing a service weapon on the

14   night of this incident, weren't you, sir?

15       A    Yes.

16       Q    And were other officers wearing weapons as

17   well?

18       A    All of them, yes.

19       Q    Is it a concern of law enforcement

20   officers that persons with whom they come in contact

21   might attempt to take their weapon from them and

22   turn it on them?

23       A    Yes.

24       Q    And is that something that you think about

25   every time you have to confront someone?